**Kimberly Dawn TRENOR, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–09–00191–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 23, 2010.

---

Greg N. Russell, Attorney at Law, Dickinson, TX, for Appellant.

Rebecca Klaren, Assistant Criminal District Attorney, Galveston, TX, for Appellee.

Panel consists of Justices KEYES, HIGLEY, and BLAND.

## OPINION

LAURA CARTER HIGLEY, Justice.

A jury found appellant, Kimberly Dawn Trenor, guilty of the capital murder of her two-year-old daughter, Riley Ann Sawyers. *See* TEX. PENAL CODE ANN. § 19.03(a)(8) (Vernon Supp.2009). The State did not seek the death penalty, and the trial court sentenced appellant to life in prison, as statutorily required. *See* TEX. PENAL CODE ANN. § 12.31(a) (Vernon Supp.2009). In two issues, appellant contends that she was denied compulsory process and that the evidence was legally and factually insufficient to support her conviction.

We affirm.

## Background

On October 29, 2007, a fisherman found a plastic tub in Galveston Bay containing Riley's body. Because nothing in the tub identified Riley, she became known as Baby Grace. In an effort to identify her, sketches of Riley were published in the media and on the Internet.

Sheryl Sawyers, Riley's grandmother who lived in Ohio, saw a sketch of Baby Grace on the Internet. Sheryl's son is Riley's biological father. Sheryl knew that Riley was living with her mother, appellant, in the Houston area. Sheryl had not seen Riley for several months. She contacted the Galveston County Sheriff's Department stating that she believed that Baby Grace was her granddaughter Riley.

At the request of the Galveston County Sheriff's Office, a Harris County Sheriff's deputy went to conduct a welfare check on Riley. The deputy spoke to Royce Ziegler, appellant's husband and Riley's stepfather. Ziegler told the deputy that there

was a custody dispute with Riley's biological father, who lived in Ohio. Ziegler stated that a representative from the Ohio Department of Child Protective Services (CPS) had come to their home, pushed appellant down, and taken Riley to Ohio. Appellant told the deputy the same story.

A deputy from the Galveston County Sheriff's Office, Deputy Jones, also spoke to Ziegler and to appellant by telephone. They told Deputy Jones that Ohio CPS had forcibly taken Riley. Appellant said that she thought Riley was in Ohio with Sheryl or Sheryl's sister. Deputy Jones asked Ziegler and appellant whether they had any paperwork from Ohio CPS documenting the taking of Riley. Ziegler and appellant said they did and that they would send the deputy the paperwork.

Through her attorney, appellant sent the authorities a letter purportedly from Ohio CPS; however, it was determined that the letter was a fake created by appellant. It was also determined that there was no open CPS case on Riley in Ohio.

Deputy Jones initially believed appellant's story regarding Riley. He became suspicious when appellant became uncooperative and hesitated to file a police report regarding Riley's disappearance. After talking to a representative with Ohio CPS, Deputy Jones contacted appellant and requested that she give a DNA sample to eliminate Riley as Baby Grace.

On November 27, 2007, appellant, accompanied by her attorney, went to the Galveston County Sheriff's Office to give a videotaped statement. Sergeant Berry and Lieutenant Hansen interviewed appellant. Appellant told the officers that, at the beginning of 2007, she met Ziegler on the Internet playing an on-line game. She lived in Ohio, and Ziegler lived in Texas. Ziegler came to visit her one time in Ohio, and then she and Riley moved to Texas in May 2007. Appellant and Ziegler were married on June 1, 2007.

Before she moved to Texas, appellant was on public assistance and had lived with Sheryl. When she and Riley moved to Texas, things seemed great. Ziegler had a job and bought things for Riley. Ziegler bought a van for appellant. He supported appellant and Riley.

At first, Ziegler did not interfere with appellant's disciplining of Riley. According appellant, Riley had behavior problems beyond that of a normal two-year-old. Appellant told her that she needed to do more than time-outs to discipline Riley. Ziegler told appellant that she needed to be more aggressive and should start spanking Riley. Appellant claimed that she would only give Riley light spankings. Ziegler then suggested that appellant start using a belt to spank Riley. Appellant said that she used the belt to spank Riley only when Ziegler was present. Ziegler also started spanking Riley with a belt. At one point, Ziegler's mother saw that Riley's bottom was black and blue. She told appellant and Ziegler that they needed to use their hands, not a belt, to spank Riley.

Appellant explained to the deputies that Ziegler stayed home from work on July 25, 2007. Ziegler was not sick, but told appellant that he was staying home to ensure that she was disciplining Riley. Ziegler told appellant that if Riley started misbehaving, then appellant should "go for the belt."

Because Riley said "I want" rather than "Please can I have," Ziegler instructed appellant to get the belt. Ziegler told appellant, "We need to break her." Ziegler told Riley that she needed to say "yes, sir," and "yes, ma'am." This was in the morning.

Throughout the day, appellant used the belt to whip Riley. Ziegler hit Riley with the belt for not saying or doing what he wanted or when she screamed. Ziegler

would also shove Riley's head face down in a pillow. Ziegler told appellant that they needed to do more because Riley continued to scream. He instructed appellant to run cold water in the bathtub. Appellant complied and filled the bathtub half full with water. Ziegler said that the next time Riley screamed they would put her in the bathtub. Appellant told the deputies that Riley naturally screamed because of the way Ziegler was hitting her with the belt.

When Riley continued not to do or say what Ziegler wanted, Riley was hit with the belt and her head was shoved under the water in the bathtub. When Riley would scream, she would be put back into the cold water. Appellant said that Ziegler hit Riley with the belt wherever her skin was exposed, including her back and her legs. Appellant confirmed that Riley was naked during the beatings.

At some point the beatings stopped. They laid Riley on ice packs to soothe her bruised body. They also gave her Tylenol. Ziegler said that they had done enough for that day. Riley was awake and trying to recover. But soon, Ziegler started beating Riley again. Ziegler got a different belt, which was thicker and hurt Riley more. Appellant stated that Ziegler hit Riley as hard as he could.

Appellant also told the deputies that Ziegler grabbed Riley by her hair and dragged her into the bathroom to submerge her in the cold water. When Riley would run away, Ziegler would put the belt around her neck and drag her back to where he had told her to stand. Appellant described how Ziegler would pick Riley up and throw her across the room or onto the tile floor. Appellant said that she heard Riley hit the floor very hard at least one time. She described hearing a "smack" when Riley hit the tile floor. Appellant believed that appellant threw Riley on the floor a couple more times. Appellant also said that at one point, Ziegler bit Riley.

Appellant denied throwing Riley. Appellant did admit to hitting Riley with the belt and to holding her head under the water in the bathtub. Appellant stated that one time when she was hitting Riley with the belt, Riley told her that she loved her. Appellant said that the beating stopped briefly, but when Riley said it again, Ziegler told appellant that Riley was saying it to control appellant and make her stop hitting Riley with the belt.

Appellant told the deputies that after one of the times that Ziegler used the belt to pull Riley back, Riley could not stand up. Appellant said that it appeared Riley did not have control over her legs anymore. Appellant told that deputies that this concerned her. But Ziegler said that it was "just another act" to get them to stop beating her. Ziegler said that Riley was pretending.

Appellant stated that eventually Riley could no longer stand. At Ziegler's request, appellant got the Tylenol. Ziegler gave Riley the medicine. Riley had trouble chewing and swallowing. Ziegler then realized that Riley was not faking.

According to appellant, she told Ziegler that they needed to call for help and get Riley to the hospital. Ziegler said that they could not call because they would go to jail. Appellant indicated that Riley's body was black and blue from the beatings.

Riley stopped breathing, and Ziegler performed CPR. Appellant said that Riley's heart was beating but she was not breathing. Ziegler thought that maybe she had Tylenol stuck in her throat. He stuck his finger in her throat but could find nothing. Ziegler then told appellant to do the same, but she could not feel anything either. When asked, appellant

confirmed that Riley did not gag when they had put their fingers down her throat.

Appellant sat on the couch, and Ziegler put Riley in appellant's arms. Appellant told the detectives that eventually Riley's heart stopped beating, and she died in her arms. Appellant said that she could feel Riley go cold.

After she died, Ziegler placed Riley in the bathtub and covered her with a towel. Ziegler told appellant that they needed to clean up and get rid of the belts and the pillow. He told her that they needed to go to the store and buy bleach and trash bags.

That same night, appellant and Ziegler went to Walmart. They each pushed a shopping cart. Appellant told the deputies that they purchased a blue plastic storage container, a chain, quick dry cement, bleach, plastic gloves, a roll of trash bags, a clip to fasten the chain, and a shovel.

When they returned home, Ziegler put on a pair of plastic gloves and went in the bathroom. Ziegler told appellant that he scrubbed Riley with bleach to remove any fingerprints. He also told her that he poured bleach into Riley's mouth and down her throat to remove any saliva that may be left from performing CPR.

Appellant insisted that they dress Riley. After she was dressed, appellant held open three separate trash bags while Ziegler put Riley's body inside the bags. At Ziegler's request, appellant got a cup for water, which Ziegler used to mix the quick cement inside the blue plastic storage container. Ziegler then put Riley into the container and placed the container outside in a storage shed.

Appellant told the deputies that Riley's body stayed in container in the storage shed for one to two months. During this time, Ziegler's family asked about Riley's whereabouts. Appellant and Ziegler lied. They said that Riley was staying with ap-

pellant's aunt and uncle in Plainsville, Texas because of the custody battle with Sheryl and Riley's father in Ohio.

Appellant also told the deputies that she and Ziegler made two night-time attempts to dispose of Riley's body. The first night she and Ziegler drove to an area with a dirt road. Ziegler stopped and began to dig a hole with a shovel in a field. After a while, Ziegler abandoned the attempt telling appellant that it would take too long to dig the hole. In the second attempt, appellant and Ziegler drove to Lake Houston to drop Riley off a bridge. Appellant then pointed out to Ziegler that the container with Riley inside may land on the ground and not in the water. For this reason, they did not dispose of Riley's body that night.

On another night, appellant and Ziegler drove to Galveston with Riley's body. Appellant was driving appellant's truck. Appellant drove down near Galveston Bay, and Ziegler took the container with Riley's body in it and put in the bay.

Appellant told the detectives that Ziegler had never been violent with her either before or after Riley's death. She told the detectives that she was not physically afraid of Ziegler after Riley's death, but she was afraid that he might leave her with nothing.

Appellant further stated that appellant had attempted suicide the previous weekend by taking an overdose of pills. She also said that she had attempted suicide that weekend by taking sleeping pills.

Appellant said that, after Riley was killed, Ziegler had disposed of all the items that he associated with her death. Appellant also said that after Baby Grace was found, Ziegler threw away the remaining items that belonged to Riley, such as her clothes and toys.

After appellant's statement, the police picked up Ziegler. He also gave a statement. In his statement, Ziegler blamed appellant for Riley's death.

Appellant was later indicted for capital murder related to Riley's death. Among the State's evidence was appellant's videotaped statement. The forensic evidence at appellant's trial included the testimony of Dr. Stephen Pustilnick, the medical examiner who had performed Riley's autopsy.

Dr. Pustilnick testified that Riley's body was in an advanced state of decomposition when he conducted the autopsy. There were no signs of bruising to Riley's skin, but he stated that was not surprising given the decomposition. Dr. Pustilnick explained that he could not tell whether Riley had been drowned or had been asphyxiated because of her advanced state of decomposition. In other words, the doctor could neither confirm nor eliminate drowning or asphyxiation as possible causes of Riley's death.

Dr. Pustilnick testified that he saw damage to Riley's vertebrae. This damage indicated to Dr. Pustilnick that Riley's neck had likely suffered multiple hyperflexions.

Dr. Pustilnick also told the jury that Riley's brain appeared pink. This indicated that she had suffered a subdural hemorrhage. Dr. Pustilnick told the jury that his examination revealed that Riley had three skull fractures. He explained that these type of skull fractures result from events such as being tossed off a roof or being thrown with force into something. He testified that such injuries do not occur from a simple slip-and-fall accident. The doctor told the jury that any one of these three skull fractures could have caused Riley's death. Dr. Pustilnick determined that the cause of Riley's death was blunt force trauma and that the manner of her death was homicide.

Based on the evidence admitted at trial, the trial court instructed the jury that it could convict appellant of capital murder on any one of three bases: (1) as the principal actor; (2) as a party to the offense; or (3) under conspirator liability. The jury returned a general verdict of guilt for capital murder. The State did not seek the death penalty, and the trial court sentenced appellant to life in prison as statutorily required.

Raising two issues, appellant now appeals her conviction.

## Compulsory Process

■ In her first issue, appellant contends that she was "deprived of her constitutional right of compulsory process."

At trial, the defense called Ziegler to testify regarding a suicide note that he had written. Ziegler's counsel informed the trial court that, upon questioning, Ziegler planned to invoke his constitutional privilege against self-incrimination.

Outside the presence of the jury, the defense asked Ziegler several questions. Ziegler refused to answer the questions, asserting his right against self-incrimination. At that point, the trial court stated, "It is clear to the Court that he is going to invoke his Fifth Amendment right to any questions resulting from this incident and the Court sees no reason to proceed further." Defense counsel responded, "If that's the court's ruling, nothing further from the defendant."

■ On appeal, appellant contends, for the first time, that she was denied her state and federal right to compulsory process. She writes, "At the time of appellant's trial, the appellant's constitutional right to compulsory process was in direct conflict with Royce Ziegler's constitutional right against self-incrimination." Appellant acknowledges that an individual's constitu-

tional privilege against self-incrimination overrides a defendant's constitutional right to compulsory process of witnesses. *Bridge v. State*, 726 S.W.2d 558, 567 (Tex. Crim.App.1986). Nevertheless, appellant requests this Court to reverse her conviction and to allow the trial court to grant testimonial immunity to Ziegler allowing him to testify in aid of appellant's defense on retrial.

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. CONST. AMEND. VI. Although this constitutional right is fundamental, compulsory process is not an absolute right and may be waived by a defendant's failure to attempt to exercise it. *See Whitmore v. State*, 570 S.W.2d 889, 897 (Tex.Crim.App.1976) (citing *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967)); *Pinkston v. State*, 744 S.W.2d 329, 335 (Tex.App.-Houston [1st Dist.] 1988, no pet.). We agree with the State that appellant has not preserved her compulsory process complaint for appeal.

For a party to preserve a complaint for appellate review, the record must reflect that the complaining party made a timely, specific request, objection, or motion to the trial court. TEX.R.APP. P. 33.1(a). This rule ensures that a trial court has the opportunity to correct mistakes at the time they are alleged to have been made. *Hull v. State*, 67 S.W.3d 215, 217 (Tex.Crim. App.2002). Here, appellant did not object at trial that she was being denied her compulsory process rights. Nor did she make the request to the trial court that she now makes on appeal: to grant immunity to Ziegler to allow him to testify. To the contrary, when the trial court stated that it saw no point in continuing the defense's examination of Ziegler in light of his assertion of privilege, defense counsel

responded, "If that's the court's ruling, nothing further from the defendant." We conclude that appellant has waived her compulsory process complaint. *See* TEX. R.APP. P. 33.1(a).

■ Even if appellant had preserved her complaint, appellant's argument is without merit. In Texas, a trial judge may grant immunity to a witness only with the consent of the State. *Graham v. State*, 994 S.W.2d 651, 654 (Tex.Crim.App.1999). There is no indication in the record that the State consented to immunity for Ziegler.

We overrule appellant's first issue.

## Sufficiency of the Evidence

In her second issue, appellant contends that the evidence was legally and factually insufficient to support her conviction for capital murder. Appellant asserts that the evidence failed to show that she possessed the requisite culpable mental state to support a conviction for capital murder.

### A. Standards of Review

This Court reviews sufficiency-of-the-evidence challenges applying the same standard of review, regardless of whether an appellant presents the challenge as a legal or a factual sufficiency challenge. *See Ervin v. State*, 331 S.W.3d 49, 52–55 (Tex. App.-Houston [1st Dist.] 2010, pet. filed) (construing majority holding of *Brooks v. State*, 323 S.W.3d 893, 912–13, 923–28 (Tex.Crim.App.2010)). This standard of review is the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See id.* Pursuant to this standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See*

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *In re Winship,* 397 U.S. 358, 361, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970); *Laster v. State,* 275 S.W.3d 512, 517 (Tex.Crim. App.2009); *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007). We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson,* 443 U.S. at 314, 318 n. 11, 320, 99 S.Ct. at 2786, 2789 n. 11, 2789; *see also Laster,* 275 S.W.3d at 518; *Williams,* 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Clayton,* 235 S.W.3d at 778. An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson,* 443 U.S. at 326, 99 S.Ct. at 2793. In viewing the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton,* 235 S.W.3d at 778. Finally, the "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt. *See Powell v. State,* 194 S.W.3d 503, 507 (Tex.Crim.App.2006).

**B. Law of the Offense**

A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003).

A person commits the offense of capital murder if he commits the offense of murder as defined in section 19.02(b)(1) and "the person murders an individual under six years of age." TEX. PENAL CODE ANN. § 19.03(a)(8).

■ The Penal Code provides that a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2003). The Penal Code further provides that a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2). When a party is not the primary actor, the State must prove conduct constituting an offense plus an act by the defendant done with the intent to promote or assist such conduct. *Beier v. State,* 687 S.W.2d 2, 3 (Tex.Crim. App.1985); *Miller v. State,* 83 S.W.3d 308, 313 (Tex.App.-Austin 2002, pet. ref'd).

■■ In determining whether a person acted as a party, the fact finder may consider events occurring before, during, and after the commission of the offense and may rely on the person's actions showing an understanding and a common design to commit the prohibited act. *See Payne v. State,* 194 S.W.3d 689, 694 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (citing *Ransom v. State,* 920 S.W.2d 288, 302 (Tex.Crim.App.1994)). The evidence must show that at the time of the offense, the parties were acting together, each contributing some part toward the execution of their common purpose. *Escobar v. State,* 28 S.W.3d 767, 774 (Tex.App.-Corpus Christi 2000, pet. ref'd). Evidence is sufficient to convict under the law of parties if

the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Ransom,* 920 S.W.2d at 302. Participation as a party in a criminal offense may be inferred from circumstances and need not be shown by direct evidence. *Scott v. State,* 946 S.W.2d 166, 168 (Tex. App.-Austin 1997, pet. ref'd).

In this case, the trial court instructed the jury that appellant could be found guilty as a party to the offense. In this regard, the court charged the jury as follows:

> If you find from the evidence beyond a reasonable doubt that on or about [the] 25th day of July 2007 in Galveston County, Texas, ROYCE CLYDE ZEIGLER, II, did then and there intentionally or knowingly cause the death of Riley Ann Sawyers, an individual under six years of age, by throwing the said Riley Ann Sawyers onto the floor or by holding the said Riley Ann Sawyers under water or by holding the said Riley Ann Sawyers' mouth and nose against a pillow or by a manner and means unknown to the Grand Jury and you further believe from the evidence beyond a reasonable doubt that on said date in said County and State, the Defendant KIMBERLY DAWN TRNOR AKA KIMBERLY DAWN ZEIGLER, acting with the intent to promote or assist the commission of Capital Murder by ROYCE CLYDE ZEIGLER, II, solicited or encouraged or directed or aided or attempted to aid the said ROYCE CLYDE ZEIGLER, II, in intentionally or knowingly causing the death of Riley Ann Sawyers, an individual under six years of age, by the said ROYCE CLYDE ZEIGLER, II, throwing the said Riley Ann Sawyers onto the floor or by holding the said Riley Ann Sawyers under water or by holding the said Riley Ann Sawyers' mouth and nose against a pillow or by a manner and means un-

known to the Grand Jury, then you will find the Defendant KIMBERLY DAWN TRENOR AKA KIMBERLY DAWN ZEIGLER guilty of Capital Murder....

## C. Sufficiency Analysis

■ Appellant makes no assertion that the evidence failed to show that Ziegler intentionally or knowingly caused the death of Riley. Instead, appellant contends that the evidence is insufficient to support the jury's guilty verdict because the evidence failed to show that she had the required intent to kill Riley. In this regard, it appears that appellant is challenging her conviction under the State's theory that she was the primary actor. As mentioned, the charge also authorized the jury to convict appellant based on her culpability as a party to the offense and as a co-conspirator.

■ We now examine the evidence to determine whether it is sufficient to support appellant's conviction as a party to the offense. If it is, we need not determine whether the evidence also supports appellant's conviction based on the other two theories. When a court's charge authorizes the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Guevara v. State,* 152 S.W.3d 45, 49 (Tex.Crim.App.2004); *Rabbani v. State,* 847 S.W.2d 555, 558 (Tex. Crim.App.1992).

The evidence presented at trial shows that, on the morning of July 25, 2007, Ziegler said to appellant, "We need to break [Riley]." Thereafter, appellant assisted and aided Ziegler in beating and abusing Riley. In her videotaped statement, appellant admitted that she hit Riley with a belt and held Riley's head under the water in the bathtub. Appellant confirmed in her statement that the beating and abuse of Riley lasted the whole day; that

is, appellant indicated that the beating lasted from the morning until Riley died in the late afternoon.

Although she denied throwing Riley, appellant admitted seeing Ziegler throw Riley onto the tile floor. She heard Riley hit the floor very hard, and she saw the back of Riley's head hit the floor. Despite this knowledge, appellant did nothing to stop the abuse or to get help for Riley. To the contrary, the evidence is such that the jury could have reasonably inferred that appellant continued to assist in Riley's beating by continuing to beat and abuse Riley herself even after she saw Ziegler throw Riley onto the tile floor.

The evidence further showed that appellant filled the bathtub with water at Ziegler's direction. This was the water in which Ziegler and appellant submerged Riley throughout the day. The evidence also showed that, at Ziegler's direction, appellant fetched the Tylenol that Ziegler gave to Riley.

The evidence also revealed that appellant was aware that Riley was in serious need of medical attention and decided to take no action. In her statement, appellant described how Riley no longer had control and use of her legs. Appellant said to Ziegler that they should get Riley to the hospital. When Ziegler pointed out that they would go to jail, appellant made no effort to get help for Riley. Even when Riley stopped breathing, appellant made no attempt to get medical assistance for her child.

The evidence further showed that, after Riley died, appellant assisted in concealing Riley's death. The evidence showed that she went shopping with Ziegler for the supplies used to cover up Riley's death. Appellant assisted Ziegler in putting Riley in the trash bags, which were then placed in the storage container.

Appellant accompanied Ziegler on his two failed attempts to dispose of Riley's body. Appellant also drove Ziegler's truck on the night that they finally disposed of Riley's body in Galveston Bay. After getting rid of her body, appellant lied to her own family, to her in-laws, and ultimately to authorities regarding Riley's whereabouts. To further the ruse, appellant drafted a fake letter to support the story concocted by her and Ziegler that Riley had been taken by Ohio CPS.

To show that evidence at trial was not sufficient to support a finding that she had the requisite intent to support a capital murder conviction, appellant cites the testimony of the medical examiner, Dr. Pustilnick, and the testimony of another of the State's medical experts, Dr. Harrell Gill–King, a forensic anthropologist. Appellant points out that the doctors' testimony indicated that Riley's skull fractures would not have been externally apparent to appellant. More specifically, Dr. Pustilnick confirmed that the post-mortem examination of Riley revealed that her scalp was not lacerated or bruised. When asked, Dr. Gill–King confirmed that, as a layperson, appellant could not have simply looked at Riley and known that she had a subdural hematoma or have been reasonably certain that she would die from her injuries.

A review of all the evidence reveals that, in addition to the testimony cited by appellant, Dr. Pustilnick also testified regarding the progression of symptoms a person experiences after suffering a subdural hematoma. He stated that, as part of this progression, a person will lose the ability to stand, no longer have a gag reflex, stop breathing, and ultimately die.

As pointed out by the State, this is exactly what appellant described in her statement with regard to what she saw Riley experience. She saw that Riley had lost control of her legs, could not stand, and had no gag reflex. Appellant then observed that Riley had stopped breath-

ing. Dr. Pustilnick testified that a person observing such symptoms would know that the person experiencing the symptoms was in need of medical attention.

In any event, the jury could have reasonably inferred that appellant had the requisite intent under the law of parties. Under that theory, the State had to show that appellant, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid Ziegler to commit the offense of capital murder. See TEX. PENAL CODE ANN. § 7.02(a)(2). As discussed, the evidence showed that appellant aided and actively participated in the day long abuse of Riley that only ended with her death. Given the level and duration of physical trauma inflicted on Riley, the jury could have reasonably inferred that appellant acted with the intent to promote or to assist the commission of the offense by aiding and attempting to aid Ziegler in his commission of the offense of capital murder. See id.

Appellant also points to the testimony of FBI agent B. Stone, who conducted a forensic search of the computers used by Ziegler and appellant. Agent Stone testified on cross-examination that he found no evidence research had been conducted before Riley's death on the computers that would indicate appellant was planning to kill or to injure Riley. While such testimony aided in appellant's defense, ample evidence, as discussed, exists in the record to support the State's theory that appellant had the requisite intent under the law of parties. Regardless of whether appellant had previously researched how to harm Riley, the evidence showed that appellant had the requisite intent at the time of the offense.

■ Lastly, appellant points to a statement she made during her videotaped interview. Appellant told the deputies, "I feel bad about what had happened. I nev-

er meant for it to happen." Appellant's statement is not enough to render the evidence insufficient to prove intent. See Sells v. State, 121 S.W.3d 748, 754 (Tex. Crim.App.2003). As the exclusive judge of witness credibility and the weight to be given such testimony, the jury is free to believe or to disbelieve any portion of a witness's testimony. See Jones v. State, 984 S.W.2d 254, 258 (Tex.Crim.App.1998). Accordingly, the jury, here, was free to believe or disbelieve all or part of appellant's statement. See id.

Viewing all the evidence, direct and circumstantial, in the light most favorable to the jury verdict, we conclude that a rational fact finder could have found, beyond a reasonable doubt, all of the essential elements of the offense, including intent. See Jackson, 443 U.S. at 319, 99 S.Ct. at 2789. More precisely, a rational jury could have found, beyond a reasonable doubt, that appellant, acting with the intent to promote or to assist the commission of the offense, aided or attempted to aid Ziegler to commit the offense of capital murder. See TEX. PENAL CODE ANN. § 7.02(a)(2). We hold that the evidence was sufficient to support the judgment of conviction.

We overrule appellant's second issue.

### Conclusion

We affirm the judgment of the trial court.