Opinion
issued December 22, 2011.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-01077-CR

———————————

Royce Clyde Zeigler, II, Appellant

V.

The State of Texas, Appellee



 



 

On Appeal from the 10th District
Court

Galveston County, Texas



Trial Court Case No. 07CR3753

 



 



MEMORANDUM OPINION

          A
jury convicted Royce C. Zeigler, II, of the offense of capital murder for the
death of his step-daughter, two-year-old Riley Ann Sawyers, and he received an
automatic sentence of life imprisonment. 
See Tex. Penal Code Ann. §§ 7.02(a)(2), (b), 19.02(b)(1), 19.03(a)(8)
(West 2011).  On appeal, Zeigler contends
that: (1) the evidence presented at trial was legally insufficient to prove
that he caused Riley’s death or that he had the requisite mental state to be
found guilty of capital murder; (3) the trial court committed reversible error
by instructing the jury on the law of parties over his no-evidence objection;
and (4) the trial court erred in denying his pre-trial motion to suppress his
videotaped statement.  Finding no error,
we affirm.

Background

Events before Riley’s
death

Zeigler became acquainted
with Kimberly Trenor through an online gaming website in early 2007.  The two eventually arranged to meet.  At that time, Trenor and her toddler
daughter, Riley, lived in Ohio with Sheryl Sawyers, Riley’s paternal
grandmother.  

Trenor, who was still in
high school, moved into Sheryl’s home about three months after Riley was born.  Sheryl was very involved in taking care of
Riley.  She shared her bedroom with Riley
and spent her time off from work taking care of Riley.  Sheryl’s son, Riley’s father, also spent time
with Riley.  Sheryl explained that while Trenor
and Riley lived with her, they used time-outs to discipline Riley, and never
used any spanking or other physical punishment. 
She said that Trenor was calm and quiet, and she seldom disciplined
Riley.  Trenor could tune out Riley’s
temper tantrums.  Sheryl never saw Trenor
become really upset about anything and never saw any signs of physical abuse on
Riley.  

Soon after their first
face-to-face meeting, Trenor and Riley moved to Texas to live with Zeigler.  Before leaving Ohio, Trenor and Riley’s father
met with Children’s Services to work out a visitation agreement.  Zeigler prepared for their arrival by renting
a home, and he and Trenor married in a civil ceremony.

Zeigler had difficulty
adjusting to living with a toddler.  At
work, Zeigler complained to his co-workers that Riley was a brat—unruly, hard
to discipline, and a little out of control. 
He expressed frustration that Trenor would not discipline Riley, and
they were going to have to start spanking Riley with a belt.  The employee cautioned Zeigler to be careful
with Riley because she was small and was in a new place.  Another recommended that Zeigler and Trenor
come to some agreement about how to discipline Riley.   Together,
Zeigler and Trenor composed a list of “Rules for Riley,” which included
bedtime, naptime, behavior in public, keeping toys picked up, and listening to
her parents.

Co-workers noticed that
Zeigler’s temper flared a number of times during his frequent telephone
conversations with Trenor.  Zeigler seemed
frustrated with Riley’s behavior and told Trenor to spank Riley to get her to
behave.  He also suggested that she use a
belt to hit Riley.  One co-worker
witnessed a telephone call during which Zeigler screamed at Trenor, ended the
call abruptly, and stormed out of the office.   


Zeigler’s mother, Nellie
Zeigler, noticed problems with the way Zeigler and Trenor disciplined Riley.  Once, when Nellie stopped by unannounced,
Trenor answered the door with a belt slung over her shoulder.  When Nellie asked Trenor what was wrong, Trenor
told her that she had just disciplined Riley and put her to bed.  Another time, Nellie noticed a bruise on
Riley’s hip.  When she confronted Zeigler
and Trenor about the injury, Zeigler looked ashamed and told her that it would
never happen again.    

Events surrounding
Riley’s death

On July 24, the evening before
Riley’s death, Zeigler told Trenor that he could not stand Riley causing
trouble in public and could not take any more of the child custody problems
with Sheryl.  Zeigler said he would
continue to pay for the house and take care of Trenor’s financial needs, but
that he was going to pack his bags and leave. 
Trenor pleaded with Zeigler, “Don’t go, don’t go.  Everything will change.”  So, he stayed the night. 

The next morning, Zeigler
e-mailed his employer, saying that he was ill and would try to come into work
later.  Zeigler’s e-mail records show
that he spent a significant amount of time that day handling work matters from
home.  

Zeigler told the police
several stories about what happened that day.  First, Zeigler claimed that he took some cold
medicine and was sick in bed all day. 
Zeigler claimed that, while he stayed in bed, he kept hearing yelling
and screaming.  Zeigler also claimed that he stayed
in bed ill for part of the day and later went for a drive.  When he returned, Riley was dead.  In a third scenario, Zeigler claimed that he
had been sick in bed, but later got up and went outside for a little bit.  He heard Trenor yelling at Riley, and when he
came back in the house, he found Riley unconscious and purple and began CPR.  He offered to
bring Riley to a friend’s house so that the friend could take her to the
emergency room, but by the time they reached a decision, it was too late.  In relating this third version, Zeigler told
the detectives, “It’s partially my fault ’cause if I hadn’t gotten onto [Trenor],
it would have never happened.”  An
investigator remarked, “Okay.  So now I’m
understanding.  So [Trenor] changed
it.  Is that what happened?”  Zeigler nodded his head up and down in
response.  

The medical examiner determined
that Riley died from blunt force trauma to the head.  He found that Riley had sustained three skull
fractures which were caused by having her head strike a fixed object with at
least three separate impacts.  The vertebra
at the base of Riley’s skull was also fractured.  These fractures indicate the magnitude of the force
applied to Riley’s skull and brain, and any one of them alone would have been
lethal.  The placement of the fracture
and the force of impact would cause the blood vessels to her brain to shear
then rupture, causing bleeding over the brain’s surface.  The State’s forensic anthropology expert agreed
with the medical examiner’s evaluation. 
Both opined that Riley suffered three skull fractures and a separation
of the vertebra, that the fractures resulted from multiple applications of
force, and that they most likely were not accidental.   

The medical examiner
explained how these injuries would manifest themselves.  First, the victim would suffer severe pain
from the impact to the back of the head, which would cause bruising and the
skull fractures. She would have a terrible headache and possibly would have seizures.
 Consistent with those symptoms, he
noted, was the finding that Riley had acetaminophen in her system.  Swelling and edema would cause the victim to
lose control over her major muscle groups—first her limbs, then speech and gag
reflex, then heart, and finally, respiration. 
She would become comatose and stop breathing as her brain continued to
swell over time.  Her death would not result
immediately from the injuries—she would have shown these signs of progressive
neurological deficit over a period of hours.

Events after Riley’s
death

Late that evening, after
Zeigler had placed Riley’s body in the bathtub, Zeigler and Trenor went to
Walmart to buy supplies in order to prepare Riley’s body for disposal.  They divided the items, and each got in a
separate checkout lane.  One bought two
pairs of gloves—one large and one small, a first aid kit, and bleach.  The other bought cement mix, a shovel, trashbags,
carabiners, a plastic container, an additional pair of large gloves, two bleach
respirators, duct tape, and an anchor chain.  They cleaned Riley’s body with bleach to
remove DNA, Trenor clothed the body, and Zeigler placed it in several trash
bags inside the plastic container.  

The next night, Trenor
and Zeigler put the container in the car and drove to a rural area with the
intent of burying Riley.  Zeigler began
to dig a hole but stopped before it was deep enough.  He could not continue, so they returned with
the container and placed it in the family storage unit.  Over the next several weeks, Zeigler and
Trenor tried once again to bury the container, but that attempt, too, was
unsuccessful.  Eventually, they drove to
Galveston Bay.  They stopped by an
abandoned railroad bridge, where Zeigler hoisted the container over the rail
and dumped it into the water.  Zeigler kept
his cell phone off that night.

Less than two weeks after Riley’s death, Zeigler and Trenor
attended Zeigler’s company picnic. 
Zeigler’s co-workers noted that Zeigler appeared at ease, and both he
and Trenor seemed to enjoy themselves chatting with other employees and their
families, playing softball, and drinking margaritas.  Zeigler had responded to the picnic
invitation that he, Trenor, and Riley would all attend.  Some of his co-workers noted Riley’s absence
and asked where she was.  Zeigler
responded to one that Riley was ill and staying with his mother.  To another, Zeigler said that his parents
were giving them a break and taking care of Riley while they attended the
picnic. 

Also during August, Nellie,
who had come to enjoy spending time with Riley on the weekends, repeatedly
asked to see her.  Trenor brushed Nellie off,
at first saying that Riley was spending the weekend with a friend, and later telling
her that Riley would be staying with relatives in Plainview, Texas long enough
to establish state residency and give Trenor an advantage in the Ohio custody
dispute.

In late October, a man
fishing in Galveston Bay found the plastic container containing Riley's body.  He opened the container, realized that it
contained a dead body, and contacted law enforcement.  Because nothing in the container identified
Riley, she became known as Baby Grace.  In
an effort to identify her, sketches were published in the media and on the
Internet.  Eventually, the investigation
led authorities to suspect that Trenor and Zeigler were involved in Riley’s
death.  

When the news of Baby
Grace broke on the Internet, Zeigler’s brother Hiram went to Zeigler’s home and
showed him the Baby Grace sketches. 
Zeigler reacted with shock—his eyes widened, his jaw dropped, and he
began pacing.  Trenor, who also was
there, showed no reaction.  Hiram asked
them to call Riley, but they would not. 
Zeigler tried to put Hiram off by saying, “She’s okay.  We just talked to her, Hiram.”  Exasperated, Hiram asked Zeigler to step
outside.  Hiram continued to press him
for information about Riley’s whereabouts. 
Eventually, Zeigler admitted that Riley was not with Trenor’s Texas relatives.  He told Hiram that Ohio CPS had accused him
of molesting Riley and that a CPS worker from Ohio had forcibly removed Riley
from the house.  He also told Hiram that
Riley’s Ohio grandmother had kidnapped her.

Meanwhile in Ohio, Sheryl
saw the sketches of Baby Grace in an online news article.  She thought the clothes looked like an outfit
that Riley received the previous Christmas. 
Then, she noticed that the case was in the Houston area, where Trenor was.
 Based on her suspicions, Sheryl called
the tip hotline provided with the article. 


K. Jones, a detective with the Criminal Investigation Division of
the Galveston County Sheriff’s Department, spoke with Sheryl.  Based on what she told him, Jones contacted
the Harris County Sheriff’s Office and asked them to conduct a child welfare
check at Zeigler’s home. 

Just days before the
child welfare check, Zeigler and Trenor had attempted, without success, to
commit suicide.  Zeigler told the police
that he took the overdose of pills for Trenor, but the pills only knocked him
out for the day.  Each wrote suicide
notes.  Zeigler’s note read, in part, “I
take my own life because of guilt for past sins which I confessed before I took
my own life.  My wife Kimberly Zeigler is
innocent and lived in fear with [sic] because of thought of what I might do to
her.”  Trenor wrote, “My heart is black
dead.  There is nothing left.  I cannot live with myself after Riley.  I go to be with her.”

On the morning of
November 12, a Harris County patrol deputy arrived at the home and found only a
dog inside.  The deputy, believing the
house had been abandoned, called the SPCA to remove the dog and touched base
with Detective Jones.  Just after the
animal control officers retrieved the dog through the window, Zeigler drove up in
a blue truck.  

When he pulled into the
driveway, Zeigler was on the telephone with Detective Jones, who had called him
about the supposed CPS case.  Zeigler
informed Jones that CPS had taken Riley away and that she was either in Ohio
with her grandmother or her grandmother’s sister.  Zeigler also complained to Jones that his
mother was constantly on his case about Riley, and that he was tired of all the
fighting over Riley, the custody problems, and the accusations of sexual abuse,
which he denied.  He informed Jones that
he was considering getting a divorce because of these problems.

Trenor and Nellie arrived
at the home about fifteen minutes later. 
Trenor, too, was on the telephone with Detective Jones.  The patrol deputy spoke again with Jones,
recommending that Jones contact the CPS office and police department in Ohio
and have them conduct a child welfare check at Sheryl’s home to verify whether
Riley was there.  Nellie also requested a
copy of the CPS letter.  Trenor told her
that she would bring the letter to her family lawyer’s office the next day.

On November 13, Trenor
created a letter on her home computer to make it look as if it were sent from
Ohio CPS on July 14.  The text of the
letter was consistent with Zeigler’s story that CPS had taken Riley back to
Ohio and accused Zeigler of sexual abuse. 


On November 20, Zeigler
called Sergeant Barry with the Galveston County Sheriff’s Department, the lead
investigator on the Baby Grace case. 
Sergeant Barry mentioned that he wanted to obtain DNA samples from
them.  Zeigler told Sergeant Barry that
he and Trenor knew that Baby Grace was not Riley, and said that Sheryl had
taken Riley and was hiding her.  Zeigler
said he would talk to Trenor and have her provide the DNA sample.  Zeigler also mentioned to Sergeant Barry that
he had the CPS letter.  

Jones obtained a copy of
the CPS letter and sent it to Ohio CPS officials.  A representative verified that the letter was
a fake and was not sent from his office. 


On November 23, Zeigler agreed
to speak with the homicide detectives in connection with their investigation.  Zeigler signed a waiver of rights and gave a
videotaped statement denying that he knew who Baby Grace was and claiming that
he believed Riley was in Ohio.  When
Zeigler indicated that he might want an attorney present, the police terminated
their questioning and took custody of Zeigler.  

After spending the night
in jail, Zeigler asked to speak again with the detectives, saying that he
wanted to talk to someone in criminal investigations because he had some
information for them.  When they arrived
that afternoon, Zeigler voiced concerns about obtaining medication for a heart
condition and anxiety, and told them that he wanted to call a family
member.  The officers informed Ziegler
they would take care of letting him make his phone call and that they would
relay his concerns to the jailers.  Then,
after signing another waiver of rights, Zeigler went on to make his November
24th statement.  In this second
videotaped statement, Zeigler told the investigators the additional different
and inconsistent versions of his activities on the day Riley died. 

Zeigler filed a pretrial
motion to suppress the November 24th videotaped statement, which the trial
court denied.  After both sides presented
their case to the jury, the State offered its proposed jury charge.  Ziegler objected to its inclusion of the law
of parties and conspiracy instructions.  The
trial court overruled those objections and submitted the case to the jury.

Discussion

I.       Sufficiency
of the evidence

          A.      Standard of review

Zeigler contends that the evidence
presented at trial was insufficient to prove that he caused Riley’s death or,
alternatively, that he had the requisite mental state to be found guilty of
capital murder.  An
appellate court reviews legal
and factual sufficiency challenges using the same
standard of review.  Griego v. State, 337 S.W.3d 902, 902 (Tex. Crim. App. 2011); Ervin v. State, 331 S.W.3d 49, 52–56
(Tex. App.—Houston [1st Dist.] 2010, pet. ref’d) (construing majority holding
of Brooks v. State, 323 S.W.3d 893,
912, 926 (Tex. Crim. App. 2010)).  Under
this standard, evidence is insufficient to support a conviction if, considering
all record evidence in the light most favorable to the verdict, a factfinder
could not have rationally found that each essential element of the charged
offense was proven beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781,
2789 (1979); In re Winship,
397 U.S. 358, 361, 90 S. Ct. 1068, 1071 (1970); Brooks, 323 S.W.3d at 899 (plurality op.); Laster
v. State, 275 S.W.3d 512,
517 (Tex. Crim. App. 2009); Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  Evidence is
insufficient under this standard in four circumstances: (1) the record contains
no evidence probative of an element of the offense; (2) the record contains a
mere “modicum” of evidence probative of an element of the offense; (3) the
evidence conclusively establishes a reasonable doubt; and (4) the acts alleged
do not constitute the criminal offense charged.  See Jackson, 443 U.S. at 314, 318 n.11, 320, 99
S. Ct. at 2786, 2789 & n.11; Laster, 275 S.W.3d at 518; Williams, 235 S.W.3d at 750.  The sufficiency of the evidence is measured by the elements
of the offense as defined in a hypothetically correct jury charge, which is one
that accurately sets out the law, is authorized by the indictment, does not
unnecessarily increase the State’s burden of proof or unnecessarily restrict
the State’s theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  If an appellate court finds the evidence
insufficient under this standard, it must reverse the judgment and enter an
order of acquittal.  See Tibbs
v. Florida, 457 U.S. 31, 41,
102 S. Ct. 2211, 2218 (1982).

An appellate court determines whether
the necessary inferences are reasonable based upon the combined and cumulative
force of all the evidence viewed in the light most favorable to the verdict.  Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App.
2007) (quoting Hooper v. State,
214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). 
When the record supports conflicting inferences, an appellate court
presumes that the factfinder resolved the conflicts in favor of the verdict and
defers to that resolution.  Jackson, 443 U.S. at 326, 99 S. Ct. at 2793;
Clayton, 235 S.W.3d at
778.  An appellate court likewise defers
to the factfinder’s evaluation of the credibility of the evidence and the
weight to give the evidence.  Williams,
235 S.W.3d at 750.  A court treats direct
and circumstantial evidence equally: circumstantial evidence can be as
probative as direct evidence, and circumstantial evidence alone can be
sufficient to establish guilt.  Clayton, 235 S.W.3d at 778 (quoting Hooper, 214 S.W.3d at 13).

          B.      Capital murder

A person commits the offense of
murder if he “intentionally or knowingly causes the death of an individual.”  Tex.
Penal Code Ann. § 19.02(b)(1) (West 2011).  A person commits the offense of capital murder
if he commits the offense of murder as defined in section 19.02(b)(1) and “the
person murders an individual under six years of age.”  Tex.
Penal Code Ann. § 19.03(a)(8). 
Because our evidentiary sufficiency analysis requires us to measure
elements of the offense as defined in a hypothetically correct jury charge for
the case, we first consider Zeigler’s contention that the trial court erred in
instructing the jury on the law of the parties as a basis for finding Zeigler
guilty of capital murder.  

                    1.       Law
of parties 

The Penal Code provides that a person
is criminally responsible as a party to an offense if the offense is committed
by his own conduct, by the conduct of another for which he is criminally
responsible, or by both.  Tex. Penal Code Ann. § 7.01(a) (West
2003); see Trenor v. State, 333
S.W.3d 799, 806 (Tex. App.—Houston [1st Dist.] 2010, no pet.).  The Penal Code further provides that a person
is criminally responsible for an offense committed by the conduct of another
if, acting with intent to promote or assist the commission of the offense, he
solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense. Tex. Penal Code Ann.
§ 7.02(a)(2).  When a party is not
the primary actor, the State must prove conduct constituting an offense plus an
act by the defendant done with the intent to promote or assist such conduct.  Beier v.
State, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985); Miller v. State, 83 S.W.3d 308, 313 (Tex. App.—Austin 2002, pet.
ref’d).

In determining whether a person acted
as a party, the factfinder may consider events occurring before, during, and
after the commission of the offense and may rely on the person’s actions
showing an understanding and a common design to commit the prohibited act.  See
Payne v. State, 194 S.W.3d 689, 694 (Tex. App.—Houston [14th Dist.] 2006,
pet. ref’d) (citing Ransom v. State,
920 S.W.2d 288, 302 (Tex. Crim. App. 1994)). The evidence must show that at the
time of the offense, the parties were acting together, each contributing some
part toward the execution of their common purpose.  Escobar
v. State, 28 S.W.3d 767, 774 (Tex. App.—Corpus Christi 2000, pet. ref’d).  Evidence is sufficient to convict under the
law of parties if the defendant is physically present at the commission of the
offense and encourages its commission by words or other agreement.  Trenor,
333 S.W.3d at 807; Ransom, 920 S.W.2d
at 302.  Participation as a party in a
criminal offense may be inferred from circumstances and need not be shown by
direct evidence.  Scott v. State, 946 S.W.2d 166, 168 (Tex. App.—Austin 1997, pet.
ref’d).

The challenged instruction authorized
the jury to find Zeigler guilty of capital murder if it found beyond a
reasonable doubt that:

on or about
the 25th day of July, 2007, in Galveston County, Texas, KIMBERLY DAWN TRENOR
AKA KIMBERLY DAWN ZIEGLER, did then and there intentionally or knowingly cause
the death of Riley Ann Sawyers, an individual under six years of age, by
striking the said Riley Ann Sawyers with or against an object unknown to the
Grand Jury or by a manner and means unknown to the Grand Jury and you further
believe from the evidence beyond a reasonable doubt that on said date in said
County and State, the Defendant ROYCE CLYDE ZEIGLER II, acting with the intent
to promote or assist the commission of Capital Murder by KIMBERLY DAWN TRENOR
AKA KIMBERLY DAWN ZEIGLER, solicited or encouraged or directed or aided or
attempted to aid the said KIMBERLY DAWN TRENOR AKA KIMBERLY DAWN ZEIGLER, in
intentionally or knowingly causing the death of Riley Ann Sawyers, an
individual under six years of age, by the said KIMBERLY DAWN TRENOR AKA
KIMBERLY DAWN ZEIGLER striking the said Riley Ann Sawyers with or against an
object unknown to the Grand Jury or by a manner and means unknown to the Grand
Jury,

OR

If you find
from the evidence beyond a reasonable doubt that the defendant, ROYCE CLYDE
ZEIGLER II, entered into a conspiracy with KIMBERLY DAWN TRENOR AKA KIMBERLY
DAWN ZEIGLER, to commit the felony offense of Injury to a Child of RILEY ANN
SAWYERS and that on or about the 25th day of July, 2007, in the County of
Galveston and State of Texas, in the attempt to carry out this agreement, if
any, KIMBERLY DAWN TRENOR AKA KIMBERLY DAWN ZEIGLER, did intentionally or
knowingly cause the death of RILEY ANN SAWYERS, an individual under six years
of age, by striking the said RILEY ANN SAWYERS with or against an object
unknown to the Grand Jury or by a manner and means unknown to the Grand Jury,
if she did, and that such offense was committed in furtherance of the unlawful
purpose to commit Injury to a Child of RILEY ANN SAWYERS and was an offense
that should have been anticipated by the said ROYCE CLYDE ZEIGLER II as a
result of carrying out of the agreement, though having no intent to commit it,

THEN

you will
find the Defendant ROYCE CLYDE ZEIGLER II guilty of capital murder.  

According to Zeigler, the trial court
erred in submitting this instruction because the evidence was not sufficient to
support a reasonable inference that Zeigler committed any act with the specific
intent to assist or encourage Trenor to murder Riley.  

A trial court may submit alternate
theories of committing the same offense to the jury in the disjunctive for the
jury to return a general verdict if the evidence is sufficient to support a
finding under any of the theories submitted. 
Holford v. State, 177 S.W3d
454, 461–62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref’d) (citing Kitchens v. State, 823 S.W.2d 256 (Tex. Crim.
App. 1991)).  Under the law of parties,
the jury can convict a defendant if it found that he was “present at the
commission of the offense and encourage[d] its commission by words or other
agreement.”  Ransom, 920 S.W.2d at 302, quoted in King v. State, 29 S.W.3d 556, 564
& n.27 (Tex. Crim. App. 2000).  In
reviewing the sufficiency of the evidence to support Zeigler’s participation as
a party, we may consider “events occurring before, during and after the
commission of the offense, and may rely on actions of the defendant which show
an understanding and common design to do the prohibited act.”  Id.
at 564 & n.28.  

According to Zeigler, the State’s
evidence focused on Zeigler’s actions following Riley’s death in attempting to
cover up the offense, which are not sufficient to establish that he had the
requisite intent at the time of the murder. 
We disagree with Zeigler’s assessment of the evidence’s scope.  The record shows that before Riley’s murder,
Zeigler expressed frustration in managing Riley’s behavior and disagreed with
Trenor’s methods of disciplining her, saying that she was not hard enough on
Riley and needed to use physical punishment.  Zeigler’s co-workers testified to the anger
and frustration he expressed to Trenor on this topic during his telephone
conversations with her.  Zeigler and
Trenor developed a list of “Rules for Riley.”  He endorsed spanking and hitting a two-year-old
with a belt as a means of controlling behavior, and looked ashamed when his
mother confronted him about a bruise on Riley’s hip.  The evening before the murder, Zeigler issued
an ultimatum to Trenor, saying that he was unwilling to continue living with
her and Riley under the conditions that existed and that something had to
change.  Contrary to Zeigler’s view,
these circumstances show more than a minor disagreement about routine
discipline.  

None of Zeigler’s statements
concerning his actions and observations on the day Riley was killed is
consistent with the symptoms of the gradual decline in brain function that
Riley suffered as a result of the skull fractures.  The purchases from Walmart, including two
pairs of large gloves, one pair of small gloves, and two bleach respirators,
support a reasonable inference that Zeigler actively participated in applying
bleach to Riley’s body to destroy any of his own DNA that might be present.  Zeigler took the lead in attempting to dispose
of Riley’s body, both digging the holes and, finally, dumping the container
into the bay.  He took pains to dispose
of the body in secret and turned off his cell phone to avoid being tracked to a
particular location.  The jury was
entitled to reject the notion that Zeigler only wanted to help Trenor give Riley
a proper burial.

Zeigler also actively participated in
the cover-up following the murder.  He fabricated
various stories to explain Riley’s absence, including the story about the Ohio
CPS worker.  He and Trenor seemed relaxed
and happy in early August after Riley’s death.  Trenor prepared the fake letter to buttress Zeigler’s
CPS story.  Also of note, Zeigler and
Trenor attempted to execute their joint suicide pact only after the Baby Grace
investigation had led law enforcement to question Riley’s disappearance.  We hold that sufficient evidence supports the
trial court’s decision to instruct the jury on the law of parties and finding
that Zeigler is guilty of capital murder under that theory.

                    2.       Causation

Zeigler also complains that the
evidence is insufficient to support a finding that he was actually present when
Riley died or that he conspired, promoted, assisted, solicited, encouraged, or
directed Trenor to kill Riley.  Zeigler’s
inconsistent and improbable stories of what transpired the day of Riley’s
murder, however, serve as evidence that he was conscious of his guilt.  See
King, 29 S.W.3d at 562.

Zeigler also made other statements
that support the jury’s finding.  In his
first videotaped interview with detectives, Zeigler responded to a detective’s demand
for the truth by saying, “I told you what happened.  I never—I did not harm Riley to kill her.  I never did that.”  In his November 24th interview, Zeigler said,
“and the thing is, you know, it’s not my nature to hurt children.  I never planned on it.  And I wasn’t in the room the day when all that
stuff was going on.  I was trying to
avoid it because of the ground rules we set in the house before.”  A jury could reasonably piece Zeigler’s
statements together and construe them as a tacit admission that he hurt
Riley.  Given Zeigler’s inconsistent
statements to police, a jury also could reasonably disbelieve his contention
that he did not kill Riley.  The
cumulative force of the evidence provides sufficient grounds for a rational
jury to find beyond a reasonable doubt that Zeigler caused Riley’s death.  

                    3.       Intent

Zeigler further claims that the
evidence does not support a finding that he conspired, promoted, assisted,
solicited, encouraged, or directed Trenor to kill Riley, or that Zeigler was
aware that Trenor intended to kill Riley. 
At trial, the State called the medical examiner who performed Riley’s
autopsy.  He testified that Riley died of
three separate fractures to her skull, likely caused by her head rapidly decelerating
due to contact with a hard surface.  The
examiner testified that she could not have fallen in such a way to have caused
these injuries on her own, and opined that the injuries did not occur
unintentionally.  This testimony,
combined with the evidence discussed above, support the inference that Zeigler
intentionally or knowingly caused Riley’s death.

          In
support of his position, Zeigler points to Louis
v. State, 329 S.W.3d 260 (Tex. App.—Texarkana 2010, pet. granted), in which
the Texarkana Court of Appeals reversed and rendered a judgment of acquittal
because it found legally insufficient evidence that the defendant intentionally
or knowingly caused the death of the child victim.  In that case, the defendant’s girlfriend’s
children made a mess during the night, spreading food and household chemicals
on the kitchen floor.  While the mother
cleaned the kitchen, she asked defendant to deal with the children, which, they
understood, meant that he would beat the children with a belt.  Throughout the day, the defendant repeatedly
beat the two-year-old son.  At bedtime, the
mother tied his wrists to the closet rod and left him there several minutes
before taking him down and putting him to bed. 
The next morning, she found that her son had died during the night.  

          The
medical examiner opined that the boy died from homicidal violence and blunt
force trauma but—unlike the medical examiner who testified in this case—the
medical examiner in Louis admitted
that she could not pinpoint exactly which injury caused the boy’s death.  She used the term “homicidal violence,” she
explained, to take into account the possibility that the boy died from asphyxiation,
because he may have had difficulty breathing while hanging in closet.  The evidence also showed that the boy had
asthma and had not received his asthma medication for at least two days before
his death.  

Also unlike this case, there was no
question that the defendant in Louis
was away from home at work when the mother discovered the boy’s body.  The defendant equivocated at first about
using a belt to beat the children, but consistently maintained that he did not
beat the children so hard that it would cause the injuries found on the boy’s
body.  The police officer who questioned the
defendant immediately after the incident testified that he did not think that the
defendant intended to cause the boy’s death and that he believed the death to
be accidental.  The mother’s testimony
corroborated the defendant’s version of the events.  Id.
at 268.  Based on this record, the
Texarkana Court of Appeals held that the evidence did not support a finding
that the defendant was aware that his conduct in beating the boy was reasonably
certain to cause the boy’s death.  Id. at 269.

The Louis court of appeals contrasted the facts in Duren v. State, 87 S.W.3d 719 (Tex.
App.—Texarkana 2002, pet. struck), in which it found sufficient evidence to
support a guilty verdict where the defendant gave inconsistent explanations of
the cause of the child’s injuries; medical doctors testified that the child’s
injuries could not have resulted from the circumstances explained by the
defendant; there were no witnesses to the incident; and the evidence showed
that the defendant had an altercation with the child’s mother shortly before
the child was injured.  Id. at 724–25, cited in Louis, 329 S.W.3d at 269. 
The Louis court also distinguished
the case before it from Montgomery v.
State, 198 S.W.3d 67 (Tex. App.—Fort Worth 2006, pet. ref’d), noting that
there, the appellate court found as sufficient evidence of intent that the
defendant gave inconsistent stories about the means by which the child’s
injuries were sustained; the child was injured while in the sole care of the
defendant; a medical doctor testified that the child’s head injuries were so
significant that a person administering the wounds would have been reasonably
certain the injuries would cause death; and the physical size of the defendant,
a college football player, relative to the sixteen-month old victim.  329 S.W.3d at 269–70 (citing Montgomery, 198 S.W.3d at 87).

Here, the facts are more similar to
those in Duren and Montgomery than those in Louis. 
Zeigler gave inconsistent stories about where he was when Riley died,
but by all accounts, he was in or around the house when she did, and none of
Zeigler’s versions of events is consistent with the medical examiner’s
testimony about the effects of Riley’s injuries.  The medical examiner unequivocally testified
that any one of the three blows to the back of Riley’s head could have resulted
in her death, and that they were intentionally inflicted.  Thus, Louis
does not support reversal of the judgment.




 

II.      Denial
of Motion to Suppress

Zeigler also contends that the trial
court abused its discretion by denying his pre-trial motion to suppress the
videotaped statement he made to detectives on November 24, 2007.  According to Zeigler, that statement was
involuntarily given because it was the product of coercion and thus
inadmissible.

A.      Standard
of review

We review a trial court’s ruling on a
motion to suppress for an abuse of discretion. 
Oles v. State, 993 S.W.2d 103,
106 (Tex. Crim. App. 1999).  An abuse of
discretion occurs when the trial court’s decision is so wrong as to lie outside
the zone of reasonable disagreement.  Cantu v. State, 842 S.W.2d 667, 682
(Tex. Crim. App. 1992).  We review the
evidence in the light most favorable to the trial court’s ruling.  Gutierrez
v. State, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).  The trial court is the exclusive factfinder
and judge of the credibility of the witnesses.  State v.
Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).  We afford almost total deference to the trial
court’s determination of historical facts supported by the record, especially
when the trial court’s findings are based on an evaluation of credibility and
demeanor.  Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  We review questions not turning on
credibility and demeanor de novo.  Id.  We
uphold a trial court’s decision if it is correct under any theory of law
applicable to the case.  Id.

B.      Coercion
in procuring statement

Zeigler contends that the trial court
should not have admitted the statement because doing so violated his rights
under both the Federal Constitution and Article 38.22 of the Texas Code of
Criminal Procedure.  A statement is
obtained in violation of a defendant’s constitutional rights if the statement
is causally related to coercive government misconduct.  Colorado
v. Connelly, 479 U.S. 157, 164, 107 S. Ct. 515, 520 (1986).  Under that standard, coercive government
misconduct renders a confession involuntary if the defendant’s “will has been
overborne and his capacity for self-determination critically impaired.”  Schneckloth
v. Bustamonte, 412 U.S. 218, 225, 93 S. Ct. 2041, 2047 (1973).  This determination is made by considering the
totality of the surrounding circumstances including the characteristics of the
accused and the details of the interrogation. 
Id. at 226, 93 S. Ct. at 2047.

The Texas Code of Criminal Procedure
provides similar protections, but with a structured, four-prong test to
evaluate the circumstances.  See Martinez v. State, 127 S.W.3d 792,
794 (Tex. Crim. App. 2004).  In order for
a statement to be inadmissible, there must be: (1) a promise of some benefit to
the accused; (2) that is positive; (3) made or sanctioned by someone in
authority; and (4) that is of such an influential nature it would cause a
defendant to speak untruthfully.  Id.  The
question is not whether the statement is true, but whether the promise would
likely lead to a false confession.  Id.

C.      Analysis

Zeigler complains that he was held in
isolation in a rubberized “suicide watch” cell away from the general jail
population, he did not receive his prescribed medication for anxiety and his
heart after requesting it, and investigating officers made him promises that
induced him to make his statement.  He
claims that the cumulative effect of these circumstances rendered his statement
involuntary.[1]  Pertinent to these contentions, the trial
court made the following findings:

·       
Zeigler was
assigned to a suicide prevention cell due to a previous suicide attempt the
week before his arrest.

 

·       
Mid-day on
November 24, 2007, Zeigler used the intercom in his cell to tell the deputy on
duty that he wanted to talk to someone in criminal investigations because he
had some information for them.

 

·       
About four hours
later, two local officers and the FBI agent involved in the investigation
interviewed Zeigler.

·       
Zeigler confirmed
that he was at the interview voluntarily and that he requested the meeting. 

 

·       
Zeigler was read
his statutory rights and warnings and indicated that he understood his
rights.  He initialed and signed the
waiver of rights form and agreed to talk to the police officers.

 

·       
Zeigler expressed
his concerns about being on suicide watch, inability to make a phone call, and
problems with medications.

 

·       
The police
officers responded to these concerns by agreeing to help him make his telephone
call and relay the remainder of the information to the jailers. 

The trial court concluded that “[t]he
promise of a phone call by police officers is not of such an influential nature
that it would cause the Defendant to speak untruthfully,” and consequently,
Zeigler freely and voluntarily waived his statutory rights.  The record supports these findings and
conclusions.  We defer to the trial
court’s decision to accord more weight and credibility to the officer’s
testimony than to Zeigler’s.  We hold
that the court’s ruling admitting the statement lies within the zone of
reasonable disagreement.  See Cantu,
842 S.W.2d at 682.  

Conclusion

We hold that the trial court did not
err in instructing the jury on the law of parties, because the evidence
supported submission of that instruction. 
We further hold that a rational jury could have found beyond a
reasonable doubt that Zeigler had the intent to and caused capital murder.  Finally, we hold that the trial court did not
err in denying Zeigler’s motion to suppress his November 24th statement.  We therefore affirm the judgment of the trial
court.

 

                                                          Jane
Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Bland and Huddle.

Do not publish.  Tex.
R. App. P. 47.2(b).











[1]
          Zeigler also claims that he was
forced to sleep in his own urine, but the correctional officer that was on duty
testified to the contrary, describing the cell’s arrangements for sleeping and
using the facilities.