PD-1341-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/6/2015 3:28:21 PM
Accepted 7/6/2015 4:04:17 PM
ABEL ACOSTA
CLERK

FILED IN
COURT OF CRIMINAL APPEALS

July 6, 2015

ABEL ACOSTA, CLERK

## No. PD-1341-14

---

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

---

STACY STINE CARY,
Appellant,

v.

THE STATE OF TEXAS,
Appellee

---

On Appeal from the Court of Appeals, Fifth District of Texas at Dallas
Court of Appeals No. 05-12-01421-CR

---

## BRIEF FOR THE STATE

---

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*JOSEPH P. CORCORAN
Assistant Attorney General
Supervising Attorney
for Non-Capital Appeals
Criminal Appeals Division
State Bar No. 00793549
Joseph.Corcoran@TexasAttorneyGeneral.gov

**\*Lead Appellate Counsel**
P. O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Facsimile: (512) 936-1280

---

ATTORNEYS FOR THE STATE

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ....................................................................ii

INDEX OF AUTHORITIES ................................................................v

STATEMENT OF THE CASE .............................................................1

STATEMENT REGARDING ORAL ARGUMENT ...............................2

STATEMENT OF THE ISSUES ........................................................2

STATEMENT OF FACTS ..................................................................2

SUMMARY OF THE ARGUMENTS ...............................................12

ARGUMENT ..................................................................................14

I.    STATE'S REPLY TO ISSUE ONE: The Court Should Affirm the Lower Court Because a Reasonable Juror Could Have Found—As This Jury Actually Found—That Appellant Did Not Intend Her Payments to Spencer to Constitute "Political Contributions," Irrespective of How the Money was Ultimately Spent..................................................................14

    A.    Appellant should be estopped from complaining that the jury was not instructed about, or required to return a verdict on, the stricter statutory proof standard for bribery.........................................................15

    B.    Standard of review for sufficiency of the evidence challenges...................................................................19

TABLE OF CONTENTS, Continued

C. Applicable law to establish bribery ....................... 21

    1. As charged here, bribery is an inchoate offense.................................................................. 21

    2. The law of parties...................................... 26

D. A rational juror could have concluded, beyond a reasonable doubt, that Appellant did not intend the illicit payments to constitute "political contributions," irrespective of how those payments were actually used................................................ 28

    1. Appellant misconstrues the statute ........... 28

    2. Appellant misapplies *Jackson* ...................... 33

II. STATE'S REPLY TO ISSUE TWO: The Court Should Affirm the Court of Appeals Because a Reasonable Juror Could Have Found Sufficient Evidence of Bribery —As This Jury Actually Found—Because Proof of a Bilateral Agreement Is Not a Pre-Condition Under All Parts of the Bribery Statute ....................... 48

A. Appellant again misconstrues both the statute and the test for legal sufficiency................................. 38

B. When reviewing all evidence and reasonable inferences therefrom, in favor of the jury's verdict, Appellant's argument fails.................................... 40

# TABLE OF CONTENTS, Continued

III. STATE'S REPLY TO ISSUE THREE: The Court Should Affirm the Lower Court Because a Reasonable Juror Could Have Found—As This Jury Actually Found—the Evidence was Sufficient to Show that Appellant Had the Requisite Intent to Commit Bribery ........................................................... 48

IV. STATE'S REPLY TO ISSUE FOUR: The Court Should Affirm the Court of Appeals Because a Reasonable Juror Could Have Found—As This Jury Actually Found—Sufficient Evidence to Support Appellant's Conviction for Engaging in Organized Criminal Activity and Money Laundering ..................................... 51

PRAYER FOR RELIEF ........................................................ 52

CERTIFICATE OF SERVICE ............................................... 53

CERTIFICATE OF COMPLIANCE WITH TEXAS RULE OF APPELLATE PROCEDURE 9.4 ........................................ 54

# INDEX OF AUTHORITIES

## Cases

*Adames v. State*, 353 S.W.3d 854 (Tex. Crim. App. 2011) ..................... 27

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) ................ 19, 34

*Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2007) ..................... 20

*Ervin v. State*, 331 S.W.3d 49 (Tex. App.–Houston [1st Dist.] 2010) .... 20

*Garza v. State*, 841 S.W.2d 19 (Tex. App.—Dallas 1992) ...................... 20

*Gear v. State*, 340 S.W.3d 743 (Tex. Crim. App. 2011) ................... 19, 20

*Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991) ....................... 35

*Guevara v. State*, 152 S.W.3d 45 (Tex. Crim. App. 2004) ................ 21, 49

*Hayes v. State*, 265 S.W.3d 673 (Tex. App.–Houston [1st Dist.] 2008) . 26

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007) ......................... 20

*Hubbard v. State*, 668 S.W.2d 419 (Tex. App.—Dallas 1984) ............... 24

*Isassi v. State*, 330 S.W.3d 633 (Tex. Crim. App. 2010) ........................ 20

*Jackson v. Virginia*, 443 U.S. 307 (1979) .................................. 12, 20, 33

*Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637 (Tex. App.—
Houston [1st Dist.] 2014) ................................................................ 35

*Marable v. State*, 85 S.W.3d 287 (Tex. Crim. App. 2002) ...................... 27

*Martinez v. State*, 696 S.W.2d 930 (Tex. App.—Austin 1985) 22, 24, 25, 39

*McCallum v. State*, 686 S.W.2d 132 (Tex. Crim. App. 1985) ........... 12, 22

*Montoya v. State*, 810 S.W.2d 160 (Tex. Crim. App. 1989) ................... 27

*Mustard v. State*, 711 S.W.2d 71 (Tex. App.—Dallas 1986) ................. 24

*Patterson v. State*, 950 S.W.2d 196 (Tex. App.—Dallas 1997) .............. 27

*Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000) ....................... 35

*Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999) .................. 16, 32

*Ransom v. State*, 920 S.W.2d 288 (Tex. Crim. App. 1994) .................... 28

*Ripkowski v. State*, 61 S.W.3d 378 (Tex. Crim. App. 2001) ............. 16, 19

*Sowells v. State*, 270 S.W. 558 (1925) ................................................. 38

*Trenor v. State*, 333 S.W.3d 799 (Tex. App.–Houston [1st Dist.] 2010) 27

## Statutes

Tex. Election Code § 251.001 ................................................................ 29

Tex. Pen. Code Ann. §§ 7.01(a), 7.02(a)(2) ....................................... 26, 47

Tex. Penal Code § 2.02(a) ..................................................................... 16

Tex. Penal Code § 36.02(a)(2) ............................................................... 21

Tex. Penal Code § 36.02(a)(4) ............................................................... 15

Tex. Penal Code § 36.02(d) ........................................................ 16

**Other Authorities**

Model Penal Code § 240.1 ......................................................... 24

## STATEMENT OF THE CASE

This is an appeal from a criminal conviction from the 366th Judicial District Court of Collin County, Texas. Following a jury trial, Stacy Stine Cary (Appellant), was convicted of all eight counts alleged in her superceding indictment as follows: one count of engaging in organized criminal activity (EOCA), six counts of bribery, and one count of money laundering. CR 314–24, 1119–58; 9 RR 57–60.[1] Appellant was sentenced in each count to ten years' incarceration, probated over ten years, with the condition that she serve 30 days in jail, and assessed a $10,000 fine. CR 1119–58. Appellant appealed. CR 1114–15.

A divided panel of the Dallas Court of Appeals affirmed all convictions. Two justices voted to affirm. *Cary v. State*, No. 05-12-01421-CR, 2014 WL 4261233, at *37 (Tex. App.—Dallas Aug. 28, 2014). The dissenting justice would have reversed all convictions. *Id.* at *49.

---

[1] "CR" refers to the Clerk's Record—the transcript of pleadings and documents filed with the clerk during trial and is followed by page number. "RR" refers to the Reporter's Record of the transcribed trial proceedings which occurred June 18, 2012 through June 27, 2012, and on October 11, 2012, and is preceded by volume number and followed by page number.

This Court granted Appellant's petition for discretionary review (PDR) on the four issues identified below. Order, *Stacy v. State*, PD-1341-14 (Tex. Crim. App. Mar. 25, 2015).

## STATEMENT REGARDING ORAL ARGUMENT

The Court has already indicated that it would permit oral argument. *Id.* The State joins Appellant's request for oral argument.

## STATEMENT OF THE ISSUES

The Court granted PDR on the first four grounds raised by Appellant, as follows:

1. Whether the State affirmatively proved Appellant's innocence by proving that the alleged bribes were "Political Contributions?"

2. Whether the evidence was sufficient to show the requisite consideration intended to support the bribery convictions?

3. Whether the evidence was sufficient to show that Appellant had the requisite intent to commit bribery?

4. Whether the evidence was sufficient to support Appellant's conviction for EOCA and money laundering?

## STATEMENT OF FACTS

This appeal ultimately turns on the meaning and weight of circumstantial evidence, which, by its very nature, is grounded in

plausible inference and *argument*. Because Texas Rule of Appellate Procedure 38.1(g) does not permit a party to advance "argument" in the Statement of Facts, however, the State will use this section to provide a brief overview of the relevant facts—reserving its inferential analysis to its argument section below. So, too, and in the interests of brevity, the State respectfully directs the Court to the majority's thorough and lengthy description of proceedings at trial, below.

Count One alleged that Appellant worked in combination with her husband David Cary; judicial candidate and ultimately judge-elect Suzanne Wooten; and Wooten's campaign manager James Stephen-Spencer, in committing bribery, money laundering, or tampering with a government record. CR 315–17. Counts Two through Seven alleged that Appellant bribed Wooten in exchange for Wooten entering the judicial race, continuing her campaign for judge, and presiding over and issuing favorable rulings in cases to which Appellant and her husband were a party. CR 317–22. Count Eight alleged Appellant was funding the criminal activity of bribery. CR 322.

Appellant was a joint owner in several petroleum-related business ventures with her siblings, working mostly on the business side rather than directly in the oil fields; she also owned her own business. 4 RR 59, 6 RR 118, 8 RR 215–16, 225. She married David Cary, a father of twin daughters with special needs, from a previous marriage. 3 RR 54, 61. David was embroiled in a heated custody battle with his ex-wife Jennifer Cary, which began six months after their divorce proceedings were finalized in late 2004. 3 RR 51–62, 81–85, 107–11, 175. Ultimately, the judge presiding over the custody proceedings, Judge Sandoval, ruled in favor of the ex-wife, and Appellant's husband was removed as joint managing conservator and ordered to pay $30,000 into an education fund for his daughters, approximately $416,000 for his ex-wife's legal fees, and $50,000 in sanctions. 3 RR 75, 78–79, 82–85. After Appellant's husband failed to timely pay these fees, his ex-wife filed a collections suit with the assistance of attorney Israel Suster. 3 RR 96–97. While the suit was pending, Appellant paid $30,000 towards the twins' education fund on behalf of her husband. 3 RR 84. Under the assumption that Appellant's husband had access to the account from which Appellant withdrew the

$30,000, Mr. Suster reported Appellant's account for "turnover," which was an investigation process into whether that asset could be used towards the collection of the $416,000 in legal fees. 3 RR 167, 169–73, 188–92. But Appellant contested this turnover action, including filing a countersuit in another court; ultimately though, citing a need to keep all related litigation together, Appellant's countersuit against Mr. Suster for fraud was transferred to the 380th District Court, over which Judge Sandoval presided. 3 RR 183–88, 157, 196–203; 11 RR 2479–84 (State's Exhibit (SX) 67), 8112–13 (SX 173).

After Appellant's husband became frustrated with his losses in the custody proceedings—including (1) his inability to transfer the case to another court, (2) the denial of his motion to recuse Judge Sandoval, and (3) the appointment of his ex-wife as sole managing conservator of their twins—he and Appellant began searching for a broader solution to their problems. 3 RR 66–68, 75, 93–95; 4 RR 14.  After seeking assistance at the Capitol in the fall of 2007, they were introduced to Spencer. 4 RR 12–14, 17–18; 11 RR 1737–41 (SX 8A).

The three met in October of 2007 at the Carys' home, during which time they discussed a broad range of topics, including Appellant's business interests. 4 RR 56–60, 63–64. At Appellant's trial, Spencer testified that no concrete plans were made between the couple and Spencer regarding legislative action or Appellant's businesses at the end of their October 2007, two-hour meeting. *Id.* In grand jury proceedings which occurred more than 4 years after that meeting, a contract dated October 9, 2007, was produced that allegedly set out an agreement for Appellant to pay Spencer $250,000 in exchange for his consulting services in four areas *unrelated* to Wooten or Judge Sandoval. 4 RR 64–65;[2] 11 RR 7763–65, 7894–96 (SX 130, 150, respectively). At Appellant's trial, the State pointed out discrepancies between the contract and Spencer's testimony—such as its suspicious near-identicality to a contract drawn up in October 2009, executed between Spencer and another company for

---

[2] Those tasks were purportedly: "(1) Assessment of a new pumping technology for possible use and deployment in your field operations; and for possible investment by you, personally; (2) Analysis of the U.S. electric marketplace, and potential investment in SmartGrid-related ventures; (3) Assistance in assessing and securing counsel in anticipation of and for contemplated litigation; and (4) Assessment and proposal for family-centered advocacy, with an emphasis on parental rights." SX 130, 150 at 1.

his consulting services—as well as discrepancies between the money Spencer received and the invoices he had produced pursuant to the contracted work. 5 RR 27–40, 214–22, 238–44; 6 RR 81–86; 11 RR 8236–41 (SX 176), 7942–46 (SX 156).

Appellant made six payments to Spencer between January 4, 2008 and March 12, 2008, totaling $150,000. 5 RR 45. Spencer provided no work product to Appellant during this period. 5 RR 31–37. Rather, he testified that he began drafting a letter with an accompanying "investor appeal" for Appellant in April 2008, identifying one business venture for her pursuit, but which he provided sometime before August 1, 2008. 5 RR 128–30, 134–35; 11 RR 7776–97, 7898–7917 (SX 135, 151, respectively), 7810 (SX 137). In July 2008, he began working on a "summary analysis of the U.S. Electric Grid Marketplace." 5 RR 183–89, 11 RR 7799–7808, 7919–28 (SX 136, 152, respectively). Spencer also shared a slideshow presentation with Appellant, detailing an approach to support their interests in parental rights. 5 RR 190–206; 11 RR 7831–92 (SX 139). This represented the bulk of the work Spencer purportedly did in exchange for $150,000—a draft letter, a summary analysis, and a slideshow.

Appellant's brother testified on her behalf at trial, indicating that working in the oil business necessitated reliance on consultants, but admitted that Appellant never shared with him the work performed by Spencer, despite Appellant's brother's experience in the fields. 8 RR 212, 216, 235–36. Rather, he affirmed that he only knew about the two companies briefed by Spencer because Appellant's trial counsel shared Spencer's memoranda with him the week before trial. 8 RR 235–36.

Spencer testified[3] that one interest area he shared with the coalition was unseating judges who did not appear to properly adhere to the family code. 4 RR 52–53. After meeting with the Carys, Spencer looked into the Cary family law proceedings and—based on that single file—identified Judge Sandoval as one such judge who should be

---

[3] Spencer was compelled to testify under Penal Code §71.04. 4 RR 30-34 (hearing granting Spencer testimonial immunity under Texas Penal Code Sec. 71.04); 4 RR 35 ([Spencer's counsel] "[I]f you weren't being compelled to testify under 71.04 at this point in time, would you invoke your Fifth Amendment right against self-incrimination?" [Spencer]: "I would, sir."). Spencer was still under indictment and that there was no plea agreement in place between the State and Spencer. 4 RR 39-40 (in which Spencer testifies before jury in direct examination that he is being compelled to testify under a grant of testimonial immunity under the Texas Penal Code; was charged with engaging in criminal activity, with bribery, and with money laundering; and there was no "agreement between the State and [Spencer] or [Spencer's] attorney;" Spencer affirmed he understood that "nothing [he] can do here today testifying is going to help [him] in whether or not the State prosecutes [him].")

unseated. 4 RR 79–82, 88–93. However, Spencer testified he did not discuss "the campaign with [the Carys]. [He] did not discuss [his] business with the Carys with Suzanne." 6 RR 42.

Spencer contacted Wooten in December 2007 to gauge her interest in running against Judge Sandoval in the March 2008 election. 4 RR 136, 141–42, 147. Wooten was the third potential candidate whom Spencer approached; the other two had declined. 4 RR 119–26, 131–33. Spencer offered to act as her campaign manager, though he had never managed a campaign before; however, he had spoken with experienced campaign manager and campaign consultant Hank Clements, who agreed to work as a subcontractor for Spencer. 4 RR 149–53, 183–84; 5 RR 43–44, 183–84. After Wooten met with Clements, she conveyed her agreement to run against Judge Sandoval to Spencer. 4 RR 155, 180–82. Spencer admitted it would take a lot of resources to run a successful campaign against an incumbent judge, and presented Wooten with a "beer" budget, consisting of $60-70,000, and a "champagne" budget in the amount of $100-150,000. 4 RR 149–53; 5 RR 45, 47–48; 11 RR 1956 (SX 39), 1938 (SX 37).

During the same period that Appellant paid Spencer $150,000.00, ostensibly for Spencer's unrelated consulting services, between January 4, 2008 and March 12, 2008, Wooten filed paperwork to run against Judge Sandoval for the 380th Judicial District Court seat in Collin County, and ultimately won the race. 5 RR 45, 76. Spencer denied that Wooten knew anything about the Carys, denied that he was putting Wooten in a difficult position and, instead, was "protecting her" by "partitioning off the two," since he "wasn't going to shut down [his] business to run a judicial campaign." 6 RR 43.

An attorney with the Texas Ethics Committee, a state agency responsible for overseeing financial reporting for lobbyists and campaigns, among other duties, testified that judicial candidates have statutory obligations to file certain financial reports. 6 RR 148–49, 151–57. These reports must include the candidate's personal resources, funds raised from donors, and loans taken or given during the campaign, in addition to campaign expenses and expenditures. 6 RR 151–53, 155, 157, 160, 162–68. Both Spencer's bank accounts and Wooten's campaign account show that the campaign expenses they incurred, *e.g.* 6 RR 54–

10

60, 71, could not have been paid without the money provided by Appellant. 7 RR 19, 26–33, 40. None of Wooten's financial statements listed the Carys or Spencer as donors or loan sources. 11 RR 2026–33 (SX 52), 2154–2432 (SX 62), 2434–59 (SX 63), 7730–40 (SX 97); 5 RR 176-79; 7 RR 19, 56.

Jay Valentine, a former consultant for David Cary's business, testified that, "during the course of trying to hire [Spencer], [Appellant's husband, David Cary,] had said several times that the reason we were going to hire Spencer was that he was the person who was able to fix problems. And he said that Spencer was the person who had fixed his situation with the judge, and was going to get his situation reversed." 8 RR 74. Valentine also testified that when Spencer talked about his role in the Wooten campaign, "Spencer's comments were more braggadocios than Cary's were. Spencer's comments were that he was able to get Wooten elected and that he owned her. He used that word two or three times. And that he – he used that as a reason for why he was able to get things done as an example of, Look, this is the kind of stuff I can do." 8 RR 76–77.

11

## SUMMARY OF THE ARGUMENT

Appellant's arguments suffer from three fundamental defects. First, Appellant misconstrues the measure for legal sufficiency under the familiar test in *Jackson v. Virginia*.[4] Specifically, Appellant asks the Court to re-weigh the evidence presented at trial in an effort to animate a determination *rejected* by a properly-instructed jury, by resolving all credibility choices and inferential conflicts *against* those explicit and implicit determinations. This she cannot do. When the jury's verdict is analyzed pursuant to the correct legal measure, as the majority did below, Appellant's arguments fail.

Second, Appellant misconstrues both the bribery statute and this Court's decision in *McCallum v. State*.[5] As charged here, bribery is an inchoate offense criminalizing the simple transfer of money with corrupt intent. It matters not whether there was a "meeting-of-the-minds" between Appellant and Wooten; or even whether Appellant's expectations regarding Wooten's behavior after the transfer of money

---

[4] 443 U.S. 307 (1979).

[5] 686 S.W.2d 132 (Tex. Crim. App. 1985).

12

were rational, or *likely*. Hence, Appellant's effort to shift legal focus away from her own acts and intentions, to examine whether Wooten acted in conformity with Appellant's hopes and expectations, is irrelevant.

Finally, much of Appellant's argument is directed to establishing legal insufficiency with respect to only *some* of the alternative theories in the charge. To this end, she often narrows her focus to only those theories that are, generally speaking, more difficult for the State to prove on this record. But by selectively attacking only a subset of available theories upon which the jury could convict, Appellant misses the mark. Here, the simplest and most salient measure for legal sufficiency is whether a rational juror could have believed, beyond a reasonable doubt, that when Appellant made each of the six payments to Spencer, she hoped to obtain favorable rulings from Wooten in pending cases in which Appellant or her husband were parties. This is the simplest restatement of the relevant question, at least on this record.[6] When Appellant's arguments

---

[6] The State does not waive, and explicitly reserves, consideration of the alternative theories of criminal liability for purposes of *Jackson* review. The State focuses on this particular theory both because it exposes the weakness of Appellant's arguments, and because it is arguably the "easiest" measure of *Jackson* sufficiency.

are analyzed with reference to this simple question—as the majority did below—legal sufficiency becomes apparent.

## ARGUMENT

I. **STATE'S REPLY TO ISSUE ONE: The Court Should Affirm the Lower Court Because a Reasonable Juror Could Have Found—As This Jury Actually Found—That Appellant Did Not Intend Her Payments to Spencer to Constitute "Political Contributions," Irrespective of How the Money was Ultimately Spent.**

With respect to the first issue, Appellant alleges that the evidence adduced at trial is insufficient to sustain her six convictions for bribery. *See* Appellant's Br. at 18–27. Specifically, Appellant contends—in contradiction to her position at trial—that the State's evidence established the payments made from her to Spencer were used to fund Wooten's campaign, and were, therefore, "political contributions." *See id.* at 20. Appellant also complains that "the jury was not instructed on, and did not return a verdict on, bribery under the much stricter standard required for political contributions, and the evidence would have been insufficient had they been so charged." *Id.* The State will address these arguments in turn.

14

### A. Appellant should be estopped from complaining that the jury was not instructed about, or required to return a verdict on, the stricter statutory proof standard for bribery.

Appellant should be estopped from assigning error to the jury charge. There are four basic alternatives to proving bribery under the relevant statute, contained in four separate subsections of the Penal Code: Section 36.02(a)(1) through (4). When prosecuting bribery under the fourth subsection, the State has a significantly higher burden of proof. *See* Tex. Penal Code § 36.02(a)(4).[7] And as relevant here, the State is *required* to proceed under the fourth subsection in some circumstances. Specifically, Section 36.02(d) reads:

> It is an exception to the application of Subdivisions (1), (2), and (3) of Subsection (a) that the benefit is a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305, Government Code.

---

[7] "[A]ny benefit that is a political contribution as defined by Title 15, Election Code,1 or that is an expenditure made and reported in accordance with Chapter 305, Government Code, if the benefit was offered, conferred, solicited, accepted, or agreed to pursuant to an express agreement to take or withhold a specific exercise of official discretion if such exercise of official discretion would not have been taken or withheld but for the benefit; notwithstanding any rule of evidence or jury instruction allowing factual inferences in the absence of certain evidence, direct evidence of the express agreement shall be required in any prosecution under this subdivision." Tex. Penal Code § 36.02(a)(4).

15

Tex. Penal Code § 36.02(d). Where a criminal statute expressly includes a provision beginning with, "It is an exception to the application of," the State "must negate the existence of [that] exception in the accusation charging commission of the offense and prove beyond a reasonable doubt that the defendant or defendant's conduct does not fall within the exception." Tex. Penal Code § 2.02(a), (b) (West 2013). For purposes of this appeal the question then becomes whether a reasonable juror could conclude, beyond a reasonable doubt, that the payments made by Appellant were not "political contributions."

But whether or not the jury was reasonable when it *actually* determined that the State proved this element beyond a reasonable doubt, Appellant should not here be permitted to complain about the lack of the related instruction pursuant to the heightened standard of proof in Penal Code § 36.02(d). "[T]he law of invited error estops a party from making an appellate error of an action it induced." *Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999); *see also Ripkowski v. State*, 61 S.W.3d 378, 389 (Tex. Crim. App. 2001) ("*Prystash* subsequently overruled *Powell* by holding that a party could estop himself from

16

complaining about the failure to submit any issue, regardless of the nature of the issue involved.").

Here, the defense theory at trial was that Appellant transferred the relevant funds to Spencer to compensate him for his work under the alleged consulting agreement; and that Appellant had no knowledge that Spencer used that money in relation to Wooten's decision to run for office, *whatsoever*. This point bears repeating: Appellant's position at trial was necessarily that the payments were *not* intended as political contributions because she paid Spencer for unrelated consulting services and had no knowledge of Spencer's activities in support of Wooten's campaign. *See*, *e.g.*, 1 RR "Motion for Directed Verdict" 4–6. But she now argues on appeal, that they *were* political contributions.

But if Appellant wanted the benefit of an instruction regarding the heightened proof requirements in Penal Code § 36.02(d), she would have had to concede to the jury—as she appears to concede on appeal—that her payments pursuant to the consulting agreement were subterfuge, fabricated several years after its purported effective date to provide a false explanation for the transfers of money from Stacy to Spencer. But

17

such an approach would fundamentally contradict her theory of the defense, and may well have been disastrous if pursued at trial. *See*, e.g., 8 RR 212–13 (eliciting testimony from Appellant's brother that he paid one consultant "a lot of money" —$60,000 in the 1980's—"[u]p front"), 219–24 (Appellant's brother describing long-held practice of hiring consultants in the oil and real estate businesses); 1 RR "Motion for Directed Verdict" 6 (Appellant's counsel arguing, "There's just not an issue of fact for the Court to send to a jury," where Spencer testified, "'I screened them. They didn't – Suzanne Wooten didn't know about this money or where it came from, or that it came from the Carys, or it came from Stacy Cary.'").

Moreover, Appellant's defensive theory (i.e., that the payments to Spencer were compensation for unrelated consulting services) necessarily required the State to prove that the payments were made for the benefit of Wooten, pursuant to Appellant's corrupt intentions under the bribery statute. In reliance on this theory of the defense, the prosecutor attempted to disprove it by tracing those payments through Spencer to Wooten, including Appellant's knowledge thereto. Now—on

18

appeal—Appellant essentially advances a new jury-argument, one that she affirmatively declined to pursue in the trial court. Appellant now contends that a hypothetical, reasonable juror would be *required* to conclude that the payments were political contributions, despite the fact that she told the *actual* jury they were not.

Appellant should not be permitted to have it both ways. For this reason Appellant should be estopped from complaining about the failure of the jury charge to include the heightened proof requirements attendant in Penal Code § 36.02(d). *See Ripkowski v. State*, 61 S.W.3d at 389.

### B. Standard of review for sufficiency of the evidence challenges.

This Court has mandated that the sufficiency of evidence standard established in *Jackson v. Virginia*, is the only standard to be used in a criminal case. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.); *see Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). On review, all evidence, and any reasonable inferences from that evidence is viewed in the light most favorable to the verdict, to determine whether any rational trier of fact could have found the

19

elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Gear*, 340 S.W.3d at 746.

The jury is the exclusive judge of witness credibility and the weight of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The reviewing court must resolve or reconcile conflicts in the evidence *in favor* of the verdict. *Id.*; *Jackson*, 443 U.S. at 326. "An appellate court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Ervin v. State*, 331 S.W.3d 49, 55 (Tex. App.–Houston [1st Dist.] 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). The appellate court must view both direct and circumstantial evidence equally when reviewing the record based on a sufficiency of the evidence claim. *Jackson*, 443 U.S. at 326; *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). The reviewing court does not resolve any conflict of fact, reweigh the evidence, or evaluate the credibility of the witnesses. *Garza v. State*, 841 S.W.2d 19, 21 (Tex. App.—Dallas 1992, no pet.).

Important, too, is when a court's charge authorizes the jury to convict on more than one theory—as the charge did here—the verdict of guilty will be upheld if the evidence is sufficient on any one of the charged theories. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). As the State will establish below, application of the rule in *Guevara* is especially important to understand the weakness in Appellant's approach.

### C.    Applicable law to establish bribery

#### 1.    As charged here, bribery is an inchoate offense.

As relevant to this case, a person commits bribery if she intentionally or knowingly offers, confers, or agrees to confer on another, any benefit as consideration for (1) the recipient's decision, vote, recommendation, or other exercise of official discretion in a judicial proceeding, or (2) the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant. Tex. Penal Code § 36.02(a)(2), (1) (West 2008)[8] (respectively); *see* 2 CR 643–48. Also, as

---

[8] Given that the law in effect at the time an offense is committed is controlling, the State cites the relevant criminal statutes from 2008.

previously established, it is an exception to the application of either of those provisions that the benefit is a "political contribution" as defined by the Election Code. *Id.* at § 36.02(d).

When it is alleged under the bribery statute that an individual offers, confers, or agrees to confer on another, and the jury is properly instructed that proof of any one of the three alleged acts would warrant conviction, no proof of a bilateral agreement is needed. *Martinez v. State*, 696 S.W.2d 930, 933 (Tex. App.—Austin 1985, pet. ref'd) (distinguishing *McCallum v. State*, 686 S.W.2d 132 (Tex. Crim. App. 1985)).[9] Appellant, however, reads *McCallum* to stand for the proposition that the "as consideration" language in the bribery statute means the State must *always* prove "a bilateral agreement—in effect an illegal contract to exchange a benefit as consideration for the performance of an official

---

[9] "After careful consideration, we find that *McCallum* is factually and legally distinguishable from the instant cause. In *McCallum*, the indictment alleged only that the defendant conferred the benefit on the recipient. Under that indictment, proof that the defendant offered the alleged benefit was not sufficient to convict. The instant indictment, on the other hand, alleges that appellant solicited, agreed to accept, and accepted the benefit from Zepeda, and the jury was properly instructed that proof of any one of the three alleged acts would warrant conviction. Thus, it was not necessary for the State to prove that appellant agreed to accept or accepted the alleged benefit, and evidence that appellant merely solicited the benefit will support the conviction." *Martinez*, 696 S.W.2d at 932.

22

function." *See* Appellant's Br. at 16. Appellant seems to argue that, while the public official need not actually "accept" that consideration, there must be proof that a benefit was actually communicated to the official, with a mutual understanding about what official performance the defendant wanted "in exchange" for the consideration. *See id.* Hence, Appellant focuses the majority of her brief on her contention that the State failed to prove Wooten had a mutual understanding regarding Appellant's expectations, as purportedly evidenced by Wooten's actions after receiving Appellant's consideration.

A careful analysis of the Court's *McCallum* opinion, however, establishes that Appellant is incorrect. *See supra*, note 9. And given this confusion with the *McCallum* holding, this appeal is an opportunity for the Court to clarify it in line with both *Martinez*, and the majority opinion below. As the Third Court persuasively reasoned in this regard:

> Under § 36.02, a person commits the offense of bribery if he intentionally or knowingly offers or solicits a benefit as consideration for a variety of official acts or omissions. Common sense dictates that when it is alleged and proved that the defendant offered or solicited a proscribed benefit, it is not necessary to further prove that the offer or solicitation resulted in a bilateral arrangement or unlawful contract with

the other party. *The offense of bribery is complete when the offer or solicitation is made.*

The relevant language of § 36.02 was taken verbatim from § 240.1 of the Model Penal Code. In Model Penal Code § 240.1, Comment 4(a) (Official Draft and Revised Comments, 1980), it is stated:

> The offense of bribery is defined in a manner that includes a completed agreement between the person who offers the bribe and the person who receives it. *It also permits prosecution of inchoate conduct intended to achieve that objective. The terms "offers" and "solicits" clearly refer to such inchoate behavior and are designed to include what might be regarded as an attempt to give or to receive a bribe.*

*Martinez*, 696 S.W.2d at 932–33 (emphasis added) (quoting Model Penal Code § 240.1, Comment 4(b), (c)); *accord Mustard v. State*, 711 S.W.2d 71, 75 (Tex. App.—Dallas 1986, no pet.) ("The offense of bribery focuses on the mental state of the actor, and is complete if a private citizen, by offering, conferring, or agreeing to confer intends an agreement.") (citing *Hubbard v. State*, 668 S.W.2d 419, 421 (Tex. App.—Dallas 1984, pet. granted)).

This approach makes particular sense given the manner in which law enforcement entities often detect and prosecute bribery. Take, for

24

example, a hypothetical defendant who decides to bribe a judge to influence the outcome of his own criminal prosecution. Assume that in order to execute his scheme, the defendant unwittingly contacts and then utilizes intermediaries, who are actually undercover police officers. Indeed, assume the ultimate target of the bribe (i.e., the judge), was not even *aware* of the undercover sting operation conducted by police to document the crime.[10] Because bribery is an inchoate offense—at least as charged here—it matters not whether there was a "meeting-of-the-minds," or even whether the defendant's expectations regarding the judge's favorable rulings, were rational or even *likely*. *See Martinez*, 696 S.W.2d at 932–33. Rather, as in both the hypothetical defendant's case and as charged here, so long as a rational juror could conclude that Appellant took an affirmative act in furtherance of her corrupt-intent-

---

[10] Indeed, this hypothetical is premised on an actual bribery prosecution that occurred in Austin, Texas, which was heavily reported in the media. Members of the Los Zetas crime syndicate attempted to bribe the Honorable Judge Sam Sparks, a federal district judge in the Western District of Texas, Austin Division. *See e.g.,* Criminal Compl., *United States. v. Francisco Agustin Colorado Cebado, also known as Francisco Colorado, Jr.*, No. 1:13-cr-00458-DEW-2 (formerly No. 1:13-mj-00471-AWA) (W.D. Tex. Sep. 5, 2013), ECF No. 1; *see also Colorado-Cebado (2)*, No. A–13–CR–458 DEW, 2013 WL 5852621 at *1 (considering United States' Motion for Detention).

scheme, as defined in the bribery statute, she is guilty of bribery.[11] *See id.*

## 2. The law of parties

The jury charge instructed that Appellant may be found criminally responsible for bribery, either as a primary actor or under the law of parties. 2 CR 643–48. A party may be criminally responsible under the law of parties in several ways. *Hayes v. State*, 265 S.W.3d 673, 678 n.4 (Tex. App.–Houston [1st Dist.] 2008, pet. ref'd). "An individual is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." Tex. Penal Code § 7.01(a). A person is also criminally liable for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* at § 7.02(a)(2). And as established below, a reasonable jury could have concluded as much here.

---

[11] This also assumes that the State has proven that the relevant payments were not political contributions, beyond a reasonable doubt. The State will analyze this issue below.

It is well-settled that a jury may be charged on the law of parties even though no such allegation is contained in the indictment. *Marable v. State*, 85 S.W.3d 287, 287 & n.2 (Tex. Crim. App. 2002) (collecting cases); *see Adames v. State*, 353 S.W.3d 854, 861 (Tex. Crim. App. 2011) (reaffirming that state and federal law both specify that due process does not require defendant's culpability as a party to be pled in charging instrument), *cert. denied*, 132 S. Ct. 1763 (2012). "This rule applies not only to the law of parties found in [s]ection 7.02(a)(2) [of the Penal Code] but also the law of parties found in [s]ection 7.02(b)." *Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989).

With respect to sections 7.01 and 7.02(a)(2), a conviction under the law of parties requires a showing that, at the time of the offense, the parties acted together and contributed to a common purpose. *Patterson v. State*, 950 S.W.2d 196, 202 (Tex. App.—Dallas 1997, pet. ref'd). In other words, the State must show conduct constituting an offense, plus an act by the defendant "done with the intent to promote or assist such conduct." *Trenor v. State*, 333 S.W.3d 799, 806 (Tex. App.–Houston [1st Dist.] 2010, no pet.). To determine whether a defendant participated as a

27

party, the Court may examine events occurring before, during, and after the commission of the offense and may rely on actions demonstrating an understanding to commit the offense. *See Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994).

> **D.** **A rational juror could have concluded, beyond a reasonable doubt, that Appellant did not intend the illicit payments to constitute "political contributions," irrespective of how those payments were actually used.**

Appellant contends that "the State affirmatively negated an essential element of the crime by proving that the alleged bribery could only have been "political contributions." Appellant's Br. at 18–19. Because Appellant misconstrues the relevant law, and because she fundamentally alters the test for legal sufficiency, the Court should reject this claim, and affirm the court below.

> **1.** **Appellant misconstrues the statute.**

The question here is whether a reasonable juror could conclude, beyond a reasonable doubt, that the payments made by Appellant were not "political contributions." To start this analysis one must first define "political contribution." To this end, the jury was given the following

definitions, which track the relevant statutes (and which Appellant has not complained of on appeal):

> "Contribution" means a direct or indirect transfer of money, goods, services, or any other thing of value and includes an agreement made or other obligation incurred, whether legally enforceable or not, to make a transfer. The term includes a loan or extension of credit, other than those expressly excluded by law, and a guarantee of a loan or extension of credit, including a loan described by law. The term does not include a loan made in the due course of business by a corporation that is legally engaged in the business of lending money and that has conducted the business continuously for more than one year before the loan is made or an expenditure required by law to be reported.
>
> "Political contribution" means a campaign contribution or an officeholder contribution.
>
> "Campaign contribution" means a contribution to a candidate or political committee *that is offered or given with the intent that it be used in connection with a campaign for elective office* or on a measure. Whether a contribution is made before, during, or after an election does not affect its status as a campaign contribution.
>
> "Expenditure" means a payment, distribution, loan, advance, reimbursement, deposit, or gift of money or any thing of value and includes a contract, promise, or agreement, whether or not legally enforceable, to make an expenditure.

2 CR 643–48 (emphasis added); *see* Tex. Election Code § 251.001(2), (5), (3), (6) (West 2008). In this case then, a "political contribution" is defined

29

as a "campaign contribution." *Id.* And, as relevant here, a campaign contribution is the direct or indirect transfer of something of value to a candidate (i.e., Wooten), "with the *intent* that it be used in connection with a campaign for elective office. . . ." *Id.* (emphasis added).

The question under the statute is not whether (or how) a given payment was *actually* used in a campaign; rather, the question is whether the person who made the payment—and who otherwise acted with corrupt intent under the statute—*subjectively intended* that the payment be used in a campaign. In other words, the target's ultimate disposition of the money is not outcome determinative to the question of the briber's intent. *See id.*

Moreover, application of this exception to the facts of this case suggests an additional nuance. As established above, and assuming that Appellant's physical act of transferring each sum aligned with her corrupt intent under the statue, each payment constituted an independent, *completed* crime. In other words, the question of intent here focusses on the instant Appellant took the volitional act of transferring each sum of money. And like the question of corrupt intent, the question

30

of whether Appellant intended that each payment be used in connection with a campaign for elective office, should necessarily be measured at the same moment.

Although the undersigned has been unable to locate precedent on this point, with all respect to the Court, no other interpretation makes sense.[12] Here, a rational juror would not be required to conclude that Appellant subjectively intended that each payment be used in Wooten's campaign simply because the money ended up there weeks or months later. First, it is difficult to imagine how Appellant can complain that the jury acted unreasonably in concluding that the payments were not political contributions, given that her defense at trial was the same. *See*

---

[12] Take, for instance, the following hypothetical. A defendant decides to bribe a judge to influence the outcome in defendant's criminal case. To this end, the defendant purchases a penthouse condominium in downtown Austin, and transfers title to the judge as part of his scheme to influence the outcome of his criminal trial. Two weeks after obtaining title to the condominium, the judge sells it, and uses every dollar of the proceeds to fund her re-election campaign. Assume that the prosecutor proved corrupt intent. Under Appellant's view, a rational juror would be *required* to conclude the payment was a political contribution because the prosecutor would necessarily have proven that it was used, dollar-for-dollar, to fund a campaign. The better view is that the target's ultimate use may be *relevant* to determine a defendant's subjective intent—or not—depending on the facts of the case. However, the target's ultimate use is not determinative under the text of the statute.

*Prystash*, 3 S.W.3d at 531 ("[T]he law of invited error estops a party from making an appellate error of an action it induced.").

Moreover, if the jury concluded that Appellant possessed a corrupt intent when transferring the money to Spencer—not that she had a specific expectation regarding Spencer or Wooten's *use* of the money, other than for Wooten to enter favorable decisions in Appellant and Appellant's husband's pending cases—Appellant's conviction must be affirmed. And in her opening brief to this Court, Appellant seems to acknowledge this line of reasoning. *See* Appellant's Br. at 34–35 ("Even in the light most favorable to the State, there was no evidence that Ms. Cary knew what Mr. Spencer was doing with the money she transferred beyond perhaps generally using it for the Wooten campaign."). In other words, Appellant continues to maintain that the evidence fails to establish she had any expectations regarding the way Spencer and Wooten used the money. *Id.* Taking Appellant's characterization at face value then, if the jury reasonably believed that the State established corrupt intent, then the jury could also have concluded that Appellant

had no real understanding or expectation regarding how Spencer or Wooten would use the money. *See id.*

Because the eventual disposition of Appellant's surreptitious payments to Spencer is not dispositive to Appellant's subjective intent regarding Wooten's ultimate use of those payments, the jury could have found that the six payments were not political contributions.

### 2. Appellant misapplies *Jackson*.

More troubling, Appellant misconstrues the test for legal sufficiency review. The test under *Jackson* focuses exclusively upon whether a decision the jury *actually* made was supported by the evidence at trial, after resolving all credibility choices and inferential conflicts in *favor* of the verdict. *Jackson*, 443 U.S. at 319. Appellant is asking the Court to re-weigh the evidence[13] presented at trial in an effort to animate a determination *rejected* by a properly-instructed jury, by resolving all credibility choices and inferential conflicts *against* those explicit and

---

[13] Most of Appellant's "evidentiary" support for this sufficiency claim is, in reality, premised on the prosecutor's *argument*, which is not evidence. *See* Appellant's Br. at 19–27.

implicit determinations. *See* Appellant's Br. at 19–27.[14] Indeed, the dissent takes the same approach below.[15]

Appellant's focus on evidence tending to contradict the jury's verdict is fundamentally at odds with the standard described in *Jackson*. Indeed, her approach (and the approach used by the dissent) may be likened to the standard for *factual* sufficiency rejected by this Court in *Brooks*. Under that now-discarded standard, the reviewing court was not required to defer to either the jury's credibility or weight determinations, and the reviewing court could sit as a thirteenth juror and "disagree with a jury's resolution of conflicting evidence and with a jury's weighing of the evidence." *Brooks*, 323 S.W.3d at 899 (internal quotations omitted). Alternatively, Appellant's approach finds similarities with the factual sufficiency standard used in *civil* cases. *E.g., Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 653 (Tex. App.—Houston [1st Dist.]

---

[14] For example, Appellant focuses almost the entirety on the prosecutor's argument at trial, tending to establish that the payments ended up being used in the campaign. *See* Appellant's Br. at 19–27.

[15] *E.g., Cary*, 2014 WL 4261233, at *42 ("The State contended and the State's evidence showed that the monies transferred in this case were political contributions—monies used to defray political expenditures incurred by Wooten during her election campaign.").

2014, pet. denied) ("When the appellants attack the factual sufficiency of an adverse finding on an issue on which they did not have the burden of proof, the appellants must demonstrate the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust."). Finally, to the extent that Appellant suggests that the State was required to disprove other reasonable hypotheses, she may be attempting to reanimate the long discarded *Geesa* standard. *See Geesa v. State*, 820 S.W.2d 154, 161–62 (Tex. Crim. App. 1991), *overruled by Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000) (rejecting the "any reasonable hypothesis" analytical construct in circumstantial evidence cases to review evidentiary sufficiency). None of these approaches is available here.

And to the extent that Appellant means to argue that her payments were political contributions as a *matter of law*, she cites no authority for this proposition. Given that the relevant factual inquiry is necessarily limited to the jury's determination regarding her *subjective* intent, Appellant fails to explain how a court could take such a question out of the jury's hands.

When the evidence is properly analyzed under the *Jackson* standard, and direct and inferential evidence *against* the jury's verdict is ignored, a rational juror could have reasonably found that Appellant's payments were not political contributions. As the lower court held:

> The evidence showed Stacy did not transfer funds directly to Wooten's campaign; Stacy's contention was that she transferred funds to Spencer to compensate him for his work under the purported consulting agreement. [An Assistant General Counsel for the Texas Ethics Committee] testified as to what constitutes a lawful political contribution under the election code in a race for a Collin County district court bench in 2008. According to [him], a political contribution to a candidate for a Collin County bench could not exceed $2,500 for the election cycle. Each of the six transfers of funds from Stacy to Spencer that were funneled to the Wooten campaign vastly exceeded the amount of an allowable political contribution to a judicial candidate, and the transfers of funds were not reported by Wooten as political contributions under the election code on any campaign finance report or amended campaign finance report filed with the Ethics Commission or as loans under the election code on any personal financial statement filed with the Ethics Commission. *See* Tex. Elec. Code Ann. § 253.155(b) (West 2010).

> Based on the applicable standard of review, a rational jury could have reasonably found that Stacy's payments were not political contributions as defined by the statute. *Stacy does not argue otherwise on appeal.*

*Cary*, 2014 WL 4261233, at \*34 (emphasis added). It bears repeating: when *Jackson* sufficiency is properly measured with reference to only the evidence *supporting* the jury's historic determination, legal sufficiency becomes apparent here. And important, too, as correctly noted by the majority in the lower court, Appellant did not challenge the jury's determination by reference to the evidence supporting its determination. *Id.* In other words, Appellant only argued that the jury was required to make an inference that it did not make; she has never contended that the inference made by the jury was not rationally grounded in the evidence *supporting* that historic decision, as *Jackson* requires. And consistent with her position in the lower court, Appellant does not here argue that the evidence supporting the jury's historic determination was insufficient to justify its conclusion. Hence, application of the proper *Jackson* measure should ineluctably lead to Appellant's convictions being affirmed, and the State asks the Court to do so here.

II.  STATE'S REPLY TO ISSUE TWO: The Court Should Affirm the Court of Appeals Because a Reasonable Juror Could Have Found Sufficient Evidence of Bribery —As This Jury Actually Found— Because Proof of a Bilateral Agreement Is Not a Pre-Condition Under All Parts of the Bribery Statute.

A.  Appellant again misconstrues both the statute and the test for legal sufficiency.

In issue two, Appellant shifts her legal-sufficiency focus to the proof of a bilateral agreement between her and Wooten, and then complains about the lack of evidence establishing both that Wooten acted in conformity with a bribe, and that Appellant received quid-pro-quo consideration in return for Appellant's payments. *See* Appellant's Br. 27–33. Because Appellant's contentions are founded on a misunderstanding of the bribery statute, the Court should reject this claim. *See supra*, Section I(D)(1).

When rejecting a similar argument, this Court once observed:

> It was not essential to the appellant's conviction that in receiving the money Patton [the target] acted with a criminal intent. In delivering the money to Patton with the intent to bribe him, the appellant committed the offense without regard to the motive of Patton in receiving the money.

*Sowells v. State*, 99 Tex. Crim. 465, 468, 270 S.W. 558, 559 (1925) (internal citations omitted). In *Sowells*, this Court advanced the bedrock

38

principle recognized by the Third Court in *Martinez*, 696 S.W.2d at 932–33. As established in Section I(C)(1), *supra*, given the way Appellant was charged, proof of bilateral agreement (or counter-consideration) is wholly unnecessary to affirm Appellant's convictions. And because Appellant improperly shifts the legal focus away from her own acts and intentions, to the supposed lack of evidence regarding whether Wooten acted in conformity with Appellant's hopes and desires, her argument fails.

For example, Appellant argues, "there was no evidence that Ms. Wooten considered dropping out of the race or that anyone thought she needed inducement to stay in once she became a candidate." Appellant's Br. at 29. Since the crime for which Appellant was charged would have been complete as of the moment she transferred money to Spencer, Wooten's thoughts or actions are irrelevant. Appellant continues: "There was not . . . evidence that Ms. Wooten had any idea that the Carys were involved with Spencer or were transferring money to him. Thus, she would not have known for whom to rule favorably." *Id.* at 30. But it matters not that a defendant's bribery scheme is well thought-out, or even likely to succeed. As charged here, bribery is an inchoate offense

39

criminalizing the transfer of money with corrupt intent. The State was required to prove nothing more. All of Appellant's remaining arguments on this point fail for the same reasons. *See id.* at 31–32.

Finally, attention should be paid to the dissent because Appellant here relies on it. *See* Appellant's Br. at 32 (quoting *Cary*, 2014 WL 4261233, at \*46 ("The evidence is equally consistent with the proposition that appellant merely hoped or believed that Wooten would make better rulings than Judge Sandoval had. Under *McCallum*, such evidence is not sufficient to prove bribery.")). The dissent's analysis again turns *Jackson* on its head. In other words, the dissent acknowledges that the relevant evidence rationally *supported* what the jury *did*, but then supplants that historic determination with an "equally consistent" inference, *against* the jury's verdict. *See id.* Because the dissent misconstrues *Jackson*, it fails to support Appellant's present argument, and should be rejected.

B. **When reviewing all evidence and reasonable inferences therefrom, in favor of the jury's verdict, Appellant's argument fails**.

The jury in Appellant's case reviewed the following evidence: Just three months prior to the beginning of the Wooten's campaign for judicial

office, Appellant and her husband were introduced to Spencer. 4 RR 56–57. Within one or two weeks of that meeting, Appellant supposedly entered into a $250,000 contract with Spencer for his services on four consulting deliverables, having nothing to do with Wooten's campaign. SX 150; 6 RR 6–50, 86–98 (demonstrating that defense counsel proffered the terms of the consulting agreement to explain that Appellant's payments to Spencer had nothing to do with Wooten). The contract looked suspiciously similar to a contract drafted and signed more than two years *later*, with a company for whom Appellant's husband worked; the contract with Appellant included a typographical error of "TDI," the name of the above-mentioned company, which Spencer had initially testified he had no idea existed at the time he entered the contract with Appellant. 5 RR 238–44; 6 RR 76–77, 81–86; SX 156, 130. Allegedly pursuant to this contract, Appellant provided wire transfers and checks to Spencer for the amounts of $50,000.00 on January 4, 2008; $25,000.00 on January 30, 2008; $25,000 on February 14, 2008; $25,000.00 on February 26, 2008; $10,000.00 on March 7, 2008; and $15,000.00 on March 14, 2008. 6 RR 40, 51–54, 96–97, 101–06; 5 RR 36; 6 RR 96–97; 7

41

RR 103–09; Defense Exhibits ("DX") 6, 5, 4. Remarkably, Appellant made these payments to Spencer despite the fact that he had produced no contract deliverables until after April 2008 and prior to August 1, 2008. 5 RR 128–30, 134–35, 183–88, 190–206.

It bears repeating that, according to Appellant at trial, all of these transferred payments to Spencer were made for wholly unrelated consulting services, and Appellant attempted to convince the jury that she had no knowledge Spencer was utilizing these payments in an effort to get Wooten elected.[16] 5 RR 27, 29, 36; 6 RR 6–50, 86–98. Under Appellant's theory at trial, Spencer's efforts to get Judge Sandoval unseated—the judge who had caused Appellant and her husband so many problems—was a *coincidence*.

The defense further attempted to demonstrate in her case-in-chief that Appellant hired Spencer, not to funnel money to Wooten's campaign, but in the official capacity as a consultant. Mr. Stine, Appellant's brother,

---

[16] Additionally, these six payments were made between the date Wooten filed for judicial candidacy and shortly after the end of the election. 6 RR 40, 58. Looking to the timing of the contract, the payments began some three months after the contract's start date (October 2007) and continued at a 2-week interval, after the first one-month break. 6 RR 40, 51-54, 96-97, 101-06.

testified that hiring consultants was a necessity in the oil business, and often yielded varied results. 8 RR 212–13, 219–20. But he also testified that he "vetted" the consultants he used, such as through asking sources familiar with the new areas he would venture into. 8 RR 220, 238–39. Here, Appellant relied only on the introduction to Spencer from Royce Poinsett, the highly credentialed legislative general counsel to then-Speaker of the House Tom Craddick, but not someone with extensive experience in the areas Appellant supposedly contracted with Spencer for his services. 4 RR 5–6, 13–19. Additionally, Mr. Stine testified that, in one instance in which he felt he had been swindled by a particular venture partner, he had not only not paid all the money up front, but he had also attempted to get his money back. 8 RR 213. Yet Appellant took no such precautions, having paid Spencer $150,000.00 in the span of 1.5 months, and only attempted to collect on a loan to Spencer of $15,000, made the next year. 6 RR 40, 51-54, 60-61.

The State also produced evidence through the testimony of Appellant's CPA that Appellant was diligent and attentive to the management of her money, namely in reporting and claiming business

and legal expenses in her tax returns. 6 RR 119–26. For example, despite Ms. Kedzie having informed Appellant that the expenses for Appellant's husband's divorce and custody proceedings were not deductible, Appellant again pressed Ms. Kedzie for their deduction, exchanging a note that said, "Thanks to my stepchildren litigious abusive narcissistic gold-digging mother, does personal legal stuff not get deducted? Why shouldn't defending my home and family be deductible?" 6 RR 120–22, 127–28; SX 172 (emphasis removed). Remarkably, however, Appellant did not list or report to her CPA that Spencer was a consultant for any of her businesses for the tax year of 2008—effectually neither claiming nor deducting as contractor wages any of the $150,000 paid to Spencer. 6 RR 127–30.

The State produced evidence that Appellant not only knew about the difficult civil litigation between her husband and his ex-wife, but took an active role: paying for his legal fees, filing as an intervenor in her husband and his ex-wife's lawsuit, and filing suit against the collections attorney for her husband's ex-wife. 3 RR 183, 186–90. And the State also produced evidence that, despite Appellant's attempt to file a lawsuit

affecting her husband's ex-wife outside of the 380th Judicial District Court, Appellant's case was ultimately transferred back to that court—and Appellant did nothing with that case to move it along until Wooten took the bench. 3 RR 218–20. Additionally, Appellant's husband also filed a second Motion to Modify in his custody proceedings in that court, only after Wooten took the bench. 3 RR 219.

Finally, a comparison of the chain of communications and bank records provides the strongest evidence that Appellant's characterization of her $150,000 payments to Spencer was a complete fabrication, and also provided a key link in supporting the jury's finding of guilt. 7 RR 96–119; SX 98A. For example, looking to the date of the transfer of monies on March 7, 2008, after Wooten won the election, evidence shows campaign consultant Clements called and texted Spencer. 6 RR 66–67; 7 RR 107–08; 11 RR 6217, 6237 (SX 81A) . Spencer later issued a cashier's check to Clements for $10,000.00, presumably as the "win" bonus as promised prior to Clements's hiring. 5 RR 48–50. But between 7:00 a.m. and 11:00 a.m. on the day of that issuance, the phone records of Spencer and the Carys show that Spencer and Appellant's husband exchanged a total of

17 text messages, and Appellant and her husband exchanged four phone calls or messages,; Appellant then arranged for $10,000.00 to be wired to Spencer, and—nearly one hour later—that same amount was issued to Clements. 7 RR 107–08; 6 RR 53–59; 11 RR 38, 43, 45–46 (SX 98A), 2939–41 (SX 77), 5517 (SX 79C), 5783 (SX 80).

Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and alone is sufficient to establish guilt. *Guevara*, 152 S.W.3d at 49. The cumulative effects of these facts are sufficient to support the conviction under the law of parties. *See id*. Namely, that Appellant's entire defense at trial was a *fabrication*. That the consulting agreement was a subterfuge, fabricated several years after its purported effective date to provide a *false* explanation for the transfers of money from Stacy to Spencer. In other words, that Appellant knowingly made each of the six payments to Spencer, hoping to obtain favorable rulings from Wooten, in cases in which Appellant or her husband were parties—*and then lied about it. See, e.g.*, 3 RR 66–68, 75, 93–95; 4 RR 14, 79–82, 88–93, 136, 141–42, 147; 5 RR 31–37, 40–41; 6 RR 54–60, 71; 7 RR 19, 26–33, 40. The cumulative effect of these facts

46

indicate that Appellant aided or attempted to aid her husband, who worked with Wooten and/or Spencer to unseat Judge Sandoval with an understanding that Wooten would issue favorable rulings to Appellant and her husband in cases already pending in front of her. *See* Tex. Pen. Code Ann. §§ 7.01(a), 7.02(a)(2) (law of parties); *see also Hayes*, 265 S.W.3d at 678, n.4 (a party may be criminally responsible under law of the parties in several ways); *Patterson*, 950 S.W.2d at 202 (at the time of the offense, the parties acted together and contributed to a common purpose); *see also Trenor*, 333 S.W.3d at 806 (State must show conduct constituting an offense, plus an act by the defendant "done with the intent to promote or assist such conduct").

Finally, Appellant's apparent concession to this Court—that her subterfuge could just as easily have been interpreted by a rational juror as an effort to avoid the contribution limits under the Election Code— fails under its own weight. First, Appellant should be required to explicitly concede her own subterfuge before urging this Court to impute its inference to the jury. Second, this contention again smacks of *Geesa* —ultimately, Appellant asserts that the State should disprove a

competing rational inference. But lastly, Appellant ignores the inverse of her argument: if the jury could infer from Appellant's deception that she was attempting to avoid the minor criminal sanction associated with contribution reporting or limits, then the jury could also rationally infer that Appellant used subterfuge to avoid public exposure of her corrupt intentions under the bribery statute.

## III. STATE'S REPLY TO ISSUE THREE: The Court Should Affirm the Lower Court Because a Reasonable Juror Could Have Found—As This Jury Actually Found—the Evidence was Sufficient to Show that Appellant Had the Requisite Intent to Commit Bribery.

In issue three, Appellant appears to shift her legal-sufficiency focus to proof of bribery more generally. *See* Appellant's Br. 33–35. But because Appellant's contentions are again founded on a misunderstanding of the bribery statute, the Court should reject this claim, too. Appellant's principal argument on this question seems to be encapsulated by the following:

> In this case, it requires speculation to conclude that any bribery occurred at all. The State's theory is that Mr. Spencer delayed sending bills until the campaign's fundraising could catch up, so that the "benefit" was being able to spend money earlier than the campaign otherwise should have. There was no evidence, however, that Ms. Wooten knew anything about this alleged benefit because there was no evidence that she

48

understood that expenses allegedly should have been recognized earlier.

Appellant's Br. at 34. But by again focusing on the particular arguments made by the prosecutor in a vacuum, and by stating the measure for legal sufficiency in terms of only the most demanding alternative theories in the charge, Appellant misapplies *Jackson* and attempts to resurrect *Geesa*. *See Guevara*, 152 S.W.3d at 49 (when a court's charge authorizes the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the charged theories).

Here, the most salient measure for legal sufficiency is whether a rational juror could have believed, beyond a reasonable doubt, that when Appellant knowingly made each of the six payments to Spencer, she hoped to obtain favorable rulings from Wooten, in cases in which Appellant or her husband were parties.[17] This is the simplest restatement of the relevant question, at least on this record.[18] Appellant's efforts to establish legal insufficiency with evidentiary arguments and

---

[17] Obviously, this measure for sufficiency assumes the State proved the payments were not intended to be political contributions.

[18] Again, the State does not waive, and explicitly reserves, consideration of the alternative theories of criminal liability for purposes of *Jackson* review.

observations beyond the scope of this simple, narrow question, should be rejected outright.

And it matters not that, as of the time Appellant made the payments to Spencer, Wooten could not yet provide Appellant the benefit Appellant hoped to receive. *See* Tex. Penal Code § 36.02(b) ("It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office or he lacked jurisdiction or for any other reason."). Rather, Appellant need only have hoped that Wooten would use her "official discretion" as a judge, at some time in the future, to change the outcome in litigation in which her or her husband were parties. *Id.*

And as established in Section II, *supra*, review of the evidence *supporting* the jury's verdict, plainly establishes legal sufficiency on this point.

IV. **STATE'S REPLY TO ISSUE FOUR: The Court Should Affirm the Court of Appeals Because a Reasonable Juror Could Have Found— As This Jury Actually Found—Sufficient Evidence to Support Appellant's Conviction for Engaging in Organized Criminal Activity and Money Laundering.**

In issue four, Appellant contends that the evidence was insufficient to support Appellant's convictions for both money laundering and EOCA. *See* Appellant's Br. 35–41. Appellant's contentions are necessarily premised on her argument that there was insufficient evidence for the jury to convict her of bribery—a predicate offense for both EOCA and money laundering. *See id.* Hence, if this Court affirms the lower court's determination that the evidence was legally sufficient to support Appellant's conviction for bribery, then Appellant's contention on this issue must be rejected too.

## PRAYER FOR RELIEF

FOR ALL THESE REASONS, the State respectfully requests that this Honorable Court to affirm the decision of the court of appeals.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

/s/ Joseph P. Corcoran
JOSEPH P. CORCORAN*

*Lead Counsel          Assistant Attorney General
Supervising Attorney
   for Non-Capital Appeals
Criminal Appeals Division
State Bar No. 00793549
Joseph.Corcoran@TexasAttorneyGeneral.gov

P. O. Box 12548, Capitol Station
Austin, Texas  78711

ATTORNEYS FOR THE STATE OF TEXAS

52

## CERTIFICATE OF SERVICE

Pursuant to Rule 9.5(b)(1) of the Texas Rules of Appellate Procedure, I do hereby certify that if the email address of attorneys designated below is on file with the electronic filing manager, a true and correct copy of the foregoing notice was served electronically by that electronic filing manager, on the following attorneys via electronic mail:

John Michael Helms Jr.
Attorney for Appellant

Moreover, I do hereby certify that if the email addresses for the designated attorneys are not on file with the electronic filing manager, a true and correct copy of the foregoing pleading was served by email, addressed to:

John Michael Helms Jr.
john@johnhelmslaw.com

/s/ Joseph P. Corcoran
JOSEPH P. CORCORAN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH
## TEXAS RULE OF APPELLATE PROCEDURE 73.1(f)

This brief complies with Tex. R. App. Proc. 9.4(i)(3) in that it contains 10,550 words, as calculated pursuant to Tex. R. App. Proc. 9.4(i)(1), in Microsoft Word 2013, Century, 14 points.

/s/ Joseph P. Corcoran
JOSEPH P. CORCORAN
Assistant Attorney General